THE FARMERS AND MECHANICS' NATIONAL BANK OF BUF-
FALO, Respondent, *v.* BENJAMIN J. LOGAN and another,
Appellants.

Where commercial correspondents, on the order of a principal, make a purchase of property ultimately for him, but on their own credit, or with their own funds, and such course is contemplated when the order is given, they may retain title in themselves until they are reimbursed.

This may be done by taking the bill of sale in their own name, and when the property is shipped, taking from the carrier a bill of lading in such terms as to show that they retain the power of control and disposition of it.

The bill of lading confers upon the person, in whose favor it is issued, or to whom it is transferred, the title to the goods; and this, although the transaction is not intended to give the permanent ownership, but to furnish security for advances of money or discount of commercial paper made upon the faith of it.

Third persons dealing with property thus shipped, though acting in good faith, in the regular course of business, and paying value, are affected by and chargeable with constructive notice of the contents of the bill of lading.

S. & D., correspondents and agents at Buffalo, of defendant B., who did business in New York, for the purpose of filling an order from B., bought on their own credit a boat load of wheat, taking a bill of sale in their

own name, the vendor knowing nothing of B. in the transaction. The wheat was loaded upon a canal boat owned and navigated by persons not connected with B. The master gave a bill of lading, stating the shipment to be by S. & D., as agents and forwarders, to New York, on account and order of plaintiff, with a direction appended to notify B. at that place. Plaintiff discounted a draft drawn by S. & D. upon B., to the order of plaintiff's cashier, which was accompanied by the bill of lading as security, and the avails were used to pay for the wheat. The draft was indorsed by plaintiff and forwarded to its correspondent bank in New York, with the bill of lading attached. Upon the draft was stamped a direction to deliver the bill to B. on his acceptance of the draft. On the bill was stamped a statement addressed to B., in substance that the wheat was pledged to plaintiff as security for payment of the draft; that the wheat was put into his custody in trust for that purpose, not to be diverted to any other use until the draft was paid, and that upon acceptance and payment of the draft plaintiff's claim would cease. Upon acceptance of the draft the bill of lading was delivered to B., who, after the wheat reached New York, but before maturity of the draft, sold it at the Produce Exchange, in that city, to defendants L. & P., who received it from the carrier and shipped it abroad. In an action for the conversion of the wheat, *held*, that the purchase by S. & D. did not pass the title to the wheat to B., but to themselves; that the facts showed their purpose to be to bar B. from the right to control or dispose of the wheat until he paid the draft, and until then plaintiff retained the title; that B. therefore, when the wheat came to his hands, had no power over it as general owner, and could convey no title; and that L. & P. were chargeable with notice of the rights of plaintiff, as evidenced by the bill of lading, and so were not protected by the fact of possession by B. and acquired no title by their purchase.

Defendants offered to prove on the trial an established course of business in the trade between Buffalo and New York in respect to transactions of this kind, which was excluded; *held*, no error.

*Williams* v. *Littlefield* (12 Wend., 362), and *Smith* v. *Lynes* (5 N. Y., 41), distinguished.

(Argued April 19, 1878 : decided November 12, 1878 )

APPEAL from judgment of the General Term of the Supreme Court of the city of New York, affirming a judgment in favor of plaintiff, entered upon a verdict.

The nature of the action and the facts are set forth sufficiently in the opinion.

*Joseph H. Choate*, for appellants. The attempt of the bank by the words printed on the bill of lading to create a

trust and lien in its favor as pledgee upon the wheat, after it had passed with its assent into the possession of Brown, the general owner, was ineffectual in law to defeat the sale by Brown to defendants. (*McFarland* v. *Wheeler*, 26 Wend., 467; *Bryce* v. *Brooks*, id., 367, 373; Story on Agency, § 34; 2 Kent's Com., 640; *Beebe* v. *Mead*, 33 N. Y., 587; *Williams* v. *Tilt*, 36 id., 319; *Pease* v. *Gloahec*, L. R., 1 Privy Council Appeals, 219; *Smith* v. *Lyner*, 5 N. Y., 41; *Wait* v. *Green*, 36 id., 566; *Durbrow* v. *McDonald*, 5 Bosw., 136; *Craig* v. *Marsh*, 2 Daly, 61; *Rawls* v. *Deshler*, 4 Abb. Ct. App. Dec., 12; *Ontario B'k* v. *New Jersey Steamboat Co.*, 59 N. Y., 510.)    The court erred in excluding evidence as to the prevailing usage and custom of plaintiff in similar dealings. (*Ontario B'k* v. *N. J. Steamboat Co.*, 59 N. Y., 510.)

*Freeman J. Fithian*, for respondent.    By the purchase of the grain at Buffalo, and payment for it with their own money, Sears & Daws became the absolute owners of it, with full power and authority to dispose of it as they chose. (*Dows et al.* v. *Nat. Ex. Bk. Toledo*, 1 Otto [U. S.], 618, WOODRUFF, Circuit Judge, opinion; *First Nat. Bk. Toledo* v. *Shaws & Co.*, 61 N. Y., 283; *Manufacturers and Traders' Nat. Bk. Buffalo* v. *Farmers and Mechanics' Bk. Buffalo*, 60 id., 40; *Ontario Bk.* v. *N. J. Steam Navigation Co.*, 59 id., 510; *Cayuga Bk.* v. *Daniels*, 47 id., 632; *Aurora*, 4 C. Robinson R., 218; *Francis* [*Duer and Randolph claim*], 9 Cranch, 183; *Merrimack* [*Kent and Albert claim*], 8 id., 317; *Woodwell* v. *Patrick*, 1 Bosw., 406; *Conrad* v. *Ins. Co.*, 1 Peters, 445; *Rochester Bk.* v. *Jones*, 4 Covert, 497; *San Jose, Ind.*, 1 Wheat., 208; *Seymour* v. *Newton*, 105 Mass., 273; *Turner* v. *Trustees Liverpool Dock Co.*, 6 Exch. R., 543; *Shepard* v. *Harrison*, L. R., 4 Q. B., 195; S. C., L. R., 6 id., 796; *Bailey* v. *Hudson R. R. R. Co.*, 49 N. Y., 75; *Pomery et al.* v. *Willis et al.*, Amer. Law R., July, 1873; *Tilden* v. *Miner*, 45 Vt. R., 96; *Wait* v. *Baker*, 2 Ekchr. R., 1; *Jenkins* v. *Osborne*, 49 E. Com. L. R., 698; *Jenkins*

v. *Brown*, 68 id., 495; *Williams* v. *Littlefield*, 12 Wend., 362.) By accepting the bills of lading, advancing the money to pay for the grain, discounting the drafts drawn for the same, and placing itself in the relation and under the obligation of consignee and owner, plaintiff became possessed of the absolute title to the property with power of disposition over it. (*City Bank* v. *R. W. and O. R. Co.*, 44 N. Y., 136; *Marine Bk.* v. *Wright*, 48 id., 1; Thames, 14 Wall., 98; *Brown* v. *Cowles*, 63 N. Y., 598; *Tilden* v. *Miner*, 45 Vt. R., 96; *Cayuga Bk.* v. *Daniels*, 47 N. Y., 632.) No title vested in Brown until payment of the drafts. (1 Cowen's Treatise, 54 and note; Jones on Bailment, p. 117; Story on Bailment, § 2, p. 4; 2 Blackstone, 395; 1 Lord Raymond's R., 46; *Ontario B'k* v. *N. J. Steam. Co.*, 59 N. Y., 510; Brown's Legal Maxims, 605; 2 Kent's Com., 324; *Griffith* v. *Foster*, 18 U; *Spraight* v. *Hawley*, 39 N. Y., 441; *Mitchell* v. *Hawley*, 16 Wallace, 550; *McNeil* v. *Tenth Nat. B'k.*, 46 N. Y., 329; *Taylor* v. *Pope*, 5 Caldwell R., 416; *McGoldrick* v. *Willits*, 52 N. Y., 318; *Ballard* v. *Burgett*, 40 id., 314; *Fawcett* v. *Osborn*, 32 Ill., 411; *McMahon* v. *Jones*, 2 Jones [Pa.], 229; *Bailey* v. *Shaw*, 4 Foster [N. H.], 297; *Stanly* v. *Gaylord*, 1 Cushing, 228; *Hotchkiss* v. *Hunt*, 49 Maine, 213; *Roland* v. *Gundy*, 3 Ohio, 127; *Saltur* v. *Everett*, 20 Wend., 267.) There was nothing done by plaintiff which would prevent it from following and claiming the grain in the hands of a *bona fide* purchaser. (*Wooster* v. *Sherwood*, 25 N. Y., 278; *Salters* v. *Everett*, 20 Wend., 267; opinion of VERPLANCK, Senator, p. 279; *Sprights* v. *Hawley*, 39 N. Y., 441; *Mitchell* v. *Hawley*, 16 Wall., *supra*.) It was defendant's duty before purchasing to call for and examine the bill of lading, and know and inquire for Brown's title and authority to sell. (*N. Bank of Milwaukee* v. *Dows*, 1 Otto, 618; *Dows* v. *Perrin*, 16 N. Y., 325; *Bk. of Toledo* v. *Shaw*, 61 id., 283; *Baker* v. *Bliss*, 39 id., 70; *McGoldrick* v. *Willets*, 52 id., 612; 2 Kent's Com., 485; *Williamson* v. *Brown*, 15 N. Y., 354.) Brown had merely a contingent interest in the grain, in the nature of a contingent remainder, after plaintiff's

title ceased, and he had no power to deal with or divert plaintiff's title. (*Ballard* v. *Burgett*, 40 N. Y., 314; *Austin* v. *Dye*, 46 id., 500; *McGoldrick* v. *Willets*, 52 id., 612; *Coggill* v. *H. and U. R. R. Co.*, 3 Gray, 545; *Ulman* v. *Barnard*, 7 id., 554; *Dehon* v. *Biglow*, 8 id., 159; *Cragen* v. *Coe*, 29 Conn., 52; *Kimball* v. *Jickman*, 42 N. H., 242; *Fick* v. *Ewen*, 46 id., 173; *Clark* v. *Welles*, 45 Vt., 4; *Couse* v. *Tregent*, 11 Mich., 65; *Hotchkiss* v. *Hunt*, 49 Me., 213; *Moakes* v. *Nicholson*, 115 English Common Law, 290.) The purchasers from Brown are not protected by the factor's act. (2 R. S., 744; 4th Edm. Stat. at Large, 461; *Covill* v. *Hill*, 4 Den., 323; *Yenni* v. *McNamee*, 45 N. Y., 614; *Cook* v. *Adams*, 1 Bos., 497; *N. Bk. of Toledo* v. *Shaw*, 61 N. Y., 283; *Florence Sew. Mach. Co.* v. *Warford*, 1 Sweeny, 433; *Bonito* v. *Mosquera*, 2 Bos., 401; *Cartwright* v. *Wilmerding*, 24 N. Y., 521.) Plaintiff was not bound to tender the amount of freight and charges paid by Brown to the carrier. (*Cregan* v. *Coe*, 29 Conn., 53; *Brown* v. *Haines*, 52 Me., 581, and Finche's Brief, 81; opinion of CHANCELLOR, id.; *Salters* v. *Everett*, 20 Wend., 267; *Jarvis* v. *Rogers*, 15 Mass., 376; *Holly* v. *Hungerford*, 8 Pick., 75; *Fielding* v. *Kymer*, 2 Brad. & Bing., 639; *Holbrook* v. *Wright*, 23 Wend., 168.) Defendants could not be allowed to prove or avail themselves of any alleged usage or custom of business among grain dealers in New York, or in the produce exchange, which would enable them to make title against plaintiff. (*Rawson* v. *Holland*, 59 N. Y., 611; *Callender* v. *Dinsmore*, 55 id., 208, 209; *Wheeler* v. *Newbould*, 16 id., 392; *Hearne* v. *Marine Ins. Co.*, 20 Wall., 488; *Fitztrue* v. *Warren*, 9 N. Y., 559; *Wolf* v. *Myers*, 3 Sandf., 7.) A pledgor may become the bailee of his pledgee, or a vendor the bailee of his vendee if the parties so agree. (Benj. on Sales [2d ed.], bk. 5, p. 748, § 807; *Reeves* v. *Cooper*, 5 Bing. [N. C.], 136; *Marvin* v. *Wallace*, 6 Ellis & Black, 726; *Tahyer* v. *Dwight*, 104 Mass., 254; Story on Bailments, §§ 58, 299; *McComber* v. *Parker*, 4 Pick., 497; *Hays* v. *Riddle*, 1 Sand., 248.)

Folger, J.  This is an action brought by the plaintiff to recover of the defendants the value of a canal boat load of wheat, alleged to be the property of the plaintiff and to have been taken by the defendants and converted to their own use.

The plaintiff recovered judgment against all of the defendants. The defendants, Logan and Preston, have appealed, and they contest the recovery. They did, in fact, take the wheat and ship it abroad for their own purposes and benefit. They bought it from the defendant, Brown, at the produce exchange in New York city, and paid for it, all in the usual course of business of that mart. They did not see, nor seek for, any evidence of the title of Brown, or of his right to sell; nor was there any, save that the wheat was in his actual custody, by virtue of a special deposit of it with him in trust, and that he had and exhibited samples of it on change.

The wheat was first owned by one Perot, at Buffalo, N. Y. It was in an elevator there. Sears and Daw were commission merchants at that place. They acted, in the purchase of wheat for him, as correspondents and agents there of the defendant Brown, who resided and did business in New York city. At this time, they had an order from him to buy two boat loads of wheat. To fill that order, they negotiated with Perot for the wheat in the elevator, and bought it for Brown. But they bought of Perot on their own credit, and they paid him for it with money obtained by them, as will appear further on. They took a bill of sale from Perot, which ran in their own name, to themselves. Perot knew not Brown in the transaction. The money, with which the wheat was paid for to Perot, was got by them in this way. After the wheat was spouted from the elevator into a canal boat, owned and navigated by persons not connected with the defendant Brown, the master of it made a bill of lading, stating the shipment of the wheat to be by them, as agents and forwarders, to New York, on account and order of the plaintiff, with a direction appended to notify Brown at that place. They then drew their own draft on Brown, to the

official order of the plaintiff's cashier. That draft and the bill of lading, with a certificate of insurance of the wheat, were given to the plaintiff, which, with notice of all the facts at that time existing, on the strength and security of those papers discounted the draft for Sears & Daw, and gave the avails thereof to them. They deposited the money thus obtained, to their own credit, in The White's Bank, and paid Perot for the wheat by their own check to him thereon. The bill of lading and other papers were retained by the plaintiff. The draft was indorsed by it to its correspondent bank in New York city. The bill of lading and certificate of insurance were pinned to the draft. There was stamped upon the draft a direction to the correspondent bank to deliver the bill of lading and certificate to Brown, on his acceptance of the draft. There was stamped on the bill of lading a statement addressed to Brown, in purport that the wheat and the insurance of it were pledged to the plaintiff, as security for the payment of the draft; and that the wheat was put into his custody, in trust, for that purpose, not to be diverted to any other use, until the draft was paid; and that upon his accepting and paying the draft, the claim of the plaintiff would cease. The papers were sent to the correspondent bank, in New York city, with instructions in conformity with the matter stamped upon the papers. The draft was presented to Brown, and was accepted by him. The bill of lading was delivered to and kept by him. After that, the wheat reached New York city; but before the maturity of the draft, Brown procured samples of it, made the sale of it, and with money got from Logan & Preston by an advance on the price, paid the freight and other charges of the carrier. Logan & Preston received the wheat from the carrier, and sent it abroad.

These facts are sufficient to make application of what we conceive to be the law controlling the case.

There lies at the base of the matter, an elementary principle of the common law well known and often stated, but which may be profitably repeated here, from a high source,

as the foundation of our discussion. A purchaser of chattels takes them, as a general rule, subject to whatever may turn out to be infirmities in the title. A purchaser in market *overt* is an exception. But if not bought there, though the purchase be *bona fide*, the title got may not prevail against the owner. Again ; where the owner has parted with the chattel to another, on a *de facto* contract, a purchaser from that other *bona fide* will obtain an indefeasible title. By a *de facto* contract is meant one which has purported to pass the property from the owner to another. (See *Cundy* v. *Lindsay*, L. R., 3 Appeal Cases, 459.)

In the case in hand, there was not a purchase by the appellants in market *overt*, for such place and effect of sale is not recognized in this State. (*Wheelwright* v. *Depeyster*, 1 J. R., 471–480; *Mowrey* v. *Walsh*, 8 Cow., 238.) The title set up by the appellants cannot prevail then, unless they purchased in good faith from the real owner, or from one to whom the real owner had parted with the goods on a *de facto* contract. The difference between the parties arises, when the question is put, to whom did Perot, the acknowledged real owner at first, part with it thereby; to Brown, or to Sears & Daw ? The appellants claim that the contract of sale from Perot was to Brown ; that he became the owner, that the wheat was indeed pledged to the plaintiff, but that Brown was the general owner and the pledgor ; that when the plaintiff, being but a pledgee, put the possession of it in Brown, it lost its lien, as against a *bona fide* purchaser from him. So that the important inquiry is, who did, upon all the facts of the case, become the owner of the wheat, by the transaction with Perot ? It is conceded to be the vital point in the case of the appellants, that Brown, from whom they purchased, had a title of his own in the goods, which, subject to the lien of the plaintiff, he could transfer, and that the voluntary surrender of the possession to him by the plaintiff enabled him to make an effectual transfer of it, free from that lien.

It will not have escaped an observation of our recital of

facts, that Brown furnished no money nor any credit for the purchase from Perot. It was bought by Sears & Daw of him, on their credit, on his trust in them that they would pay for it. Nor was the draft discounted by the plaintiff on the credit of Brown. The bill of lading and the insurance upon the wheat were the security upon which the plaintiff rested. Sears & Daw remained liable until the draft was paid or they were discharged by some act of the plaintiff. Nor did Brown, when he ordered the purchase of the wheat, expect to furnish the money to pay the seller of it. He expected, and Sears & Daw expected, that the money would be got in the way in which it was got. Nor was there any act of Perot, or of Sears & Daw, in dealing with the wheat, which, of itself, passed the title to it to Brown. (*The Mechanics and Traders' Bank of Buffalo* v. *The Farmers and Mechanics' National Bank of Buffalo*, 60 N. Y., 40.) The bill of the sale from Perot was to Sears & Daw. The bill of lading from the carrier was not to Brown, it was to Sears & Daw, to the account and order of the plaintiff. The shipment is stated, indeed, to be by them as agents and forwarders. That phrase does not of itself point to Brown as the principal or consignee; and when understood, in knowledge of all the facts, does not declare or suggest his ownership of the wheat. In sooth, all the paper evidence, up to the time that the bill of lading went into the keeping of the plaintiff, gives no sign of ownership in Brown; but, on the contrary, does show ownership in Sears & Daw transferred to no one, save it be the plaintiff. And the facts given by the oral testimony show the purpose to bar Brown from the right to control or dispose of the wheat, until he paid the draft. The case of *Turner* v. *The Trustees of the Liverpool Docks* (6 Exch. [Welsby, Hurl. & Gordon], 543), is pertinent. Merchants in Liverpool sent orders to merchants in Charleston, to ship cotton on account of the former, in their vessel, for her voyage to Liverpool. They in Charleston bought cotton, and shipped it in that vessel. They took a bill of lading " to order or to our

assigns," and indorsed it " deliver the within to The Bank of Liverpool or order."   They drew drafts on the merchants in Liverpool, and delivered the bill of lading to a bank in Charleston and, on security of it, sold the drafts to the bank, and used the avails to pay for the cotton, or to reimburse themselves for advances therefor.   They in Liverpool did not pay the bills.   When the cotton reached that port, the question arose, to whom did the cotton belong ?   It was held that the property in it did not vest absolutely in them in Liverpool, notwithstanding the delivery of it on board their ship to their servant, the master ; but that they in Charleston, by the terms of the bill of lading, had reserved to themselves a *jus disponendi* of the cotton, and that they had not divested themselves of their property in or possession of the goods ; and that having bought the cotton with their own funds on their own credit, they retained their property in it until payment was made for it by the men in Liverpool.   (See in acc. *The Frances*, 9 Cranch, 183.)   There are facts in the case cited, (6 Exch., *supra*) not stated by us, which make it a stronger case for the principals in Liverpool than the one in hand is for Brown.   It was decided in the Exchequer Chamber, after elaborate argument and full consideration.   It has been since recognized and approved as sound and authoritative.   (See *Mirabita* v. *Imp. Ottoman Bank*, L. R., 3 Exch. Div., 164.)   The conclusion reached in it satisfies our judgment ; the principle declared in it is sound, and applicable to and decisive of the point we are now considering.

When commercial correspondents, on the order of a principal, make a purchase of property ultimately for him, but on their own credit, or with funds furnished or raised by them, and such course is contemplated when the order is given, they may retain the title in themselves, until they are reimbursed.   One of the means by which this may be done, is by taking the bill of sale in their own names, and when the property is shipped, by taking from the carrier a bill of lading in such terms as to show that they retain the

power of control and disposition of it.    This results neces-
sarily from the nature of the transaction.    It is not, at once,
an irrevocable appropriation of the property to the principal.
It rests, for all of its efficiency and prospect of performance,
upon the intention to withhold and the withholding the right
to the property, so that that right may be used to procure
the money with which to pay.    It contemplates no title in
the principal, until he has reimbursed to his correspondents
the price paid by them, or to the person with whom they
have dealt, the money obtained from him, with which to pay
that price.    From the start, the idea formed and nursed is,
that the property shall be the means of getting the money
with which to pay for it, and that the title shall not pass to
him who is to be the ultimate owner, until he has repaid the
money thus got.

Although such correspondents act as agents, and are set in
motion by the principal who orders the purchase, yet their
rights as against him, in the property, are more like those
of a vendor against a vendee, in a sale not wholly performed,
where delivery and payment have not been made, and where
delivery is dependent upon payment.    And so in the case
cited from 6 Exch. (*supra*), such cases of vendor and vendee
are looked to as authority, and *e converso*, that case is relied
upon in L. T. Rep., 3 Ex. D. (*supra*), which was such a case
of vendor and vendee.    The rule laid down is, that the prop-
erty remains in the shipper ; or that he has a *jus disponendi*,
a property or power which enables him to confer a title on a
pledgee or vendee, though in breach of his contract with his
first vendee ; and that whichever it is, the result must be the
same : (Id.)    If the vendor, when shipping the articles which
he intends to deliver under the contract, takes the bill of
lading to his own order, and does so not as agent or on
behalf of the purchaser, but on his own behalf, he thereby
reserves to himself a power of disposing of the property,
and consequently there is no final appropriation, and the
property does not on shipment pass to the purchaser : (Id.)
So, if the vendor deals with or claims to retain the bill of

lading in order to secure the contract price, as when he sends it forward with a draft attached, and with directions that it is not to be delivered to the purchaser until payment of the draft, the appropriation is not absolute, and until payment or tender of the price, is conditional only, and until then the property of the goods does not pass to the purchaser: (Id) ; and to this *Turner* v. *Trustees, supra,* is cited. We see no principle which distinguishes the case of a vendor and vendee, in this respect, from that of a correspondent or agent, buying for another, yet paying the price from his own means, or from moneys by agreement raised upon the property, or upon his own credit, and holding the property as security, until the principal has made reimbursement. Such is the purpose of the parties. There is no intent that the property shall be appropriated, until payment is made. And unless third parties are unavoidably misled to their harm, they have no cause to complain of a purpose so reasonable and productive of so good results.

We think that the adjudications, on this side of the water, are to the same end. There have been repeated adjudications in this court, whereby the legal effect of a bill of lading has been determined, when it contained some special clause or notation, or had upon it an indorsement which pointed out a particular person, as the one on whose account the property named in it was to be carried and delivered. (*Bank of Rochester* v. *Jones,* 4 N. Y., 497; *Dows* v. *Perrin,* 16 id., 325; *Mechanics and Traders' Bank* v. *Farmers and Mechanics' Bank,* 60 id., 40; *First National Bank of Toledo* v. *Shaw,* 61 id., 283; S. C. on second appeal, 69 id., 624; *Marine Bank of Buffalo* v. *Fiske,* 71 id., 353; *Bank of Commerce* v. *Bissell,* 72 id., 615.) The bill of lading of goods, thus affected, *prima facie* confers upon the person in whose favor it is issued, or to whom it is transferred, the legal title to them. (4 N. Y., *supra.*) That result is, though the transaction is not intended to give the permanent ownership, but to furnish a security for advances of money or discount of commercial paper,

made upon the faith of it. Third persons, dealing with property thus shipped, though acting in good faith, in the regular course of business, and paying value, are affected by the terms of the bill of lading, are bound to look into it, and are chargeable with a constructive notice of the contents of it. In the case in hand, had the appellants asked for the bill of lading, and looked into it, they would have seen that the property described in it was in the possession of Brown, with a special and restricted right over it, and that they could not deal with it safely, until there had been a compliance with the condition attached to that possession. (*City Bank* v. *R. W., and O. R. R. Co.*, 44 N. Y., 136.) And as they were chargeable with a constructive notice of the contents of it, there is the same legal result as if they had looked into it. (Id.)

We do not understand that the learned counsel for the appellants takes a position which he will admit is hostile to these adjudications. He seeks to distinguish the case at bar from those cited. He admits, as we understand him, that had this case stood alone upon the bill of lading, the defendants would have been properly cast in judgment. But he insists that Brown was the general owner of the wheat; that the plaintiff voluntarily put it into his possession; that being in his possession with its consent, he being general owner of it, the appellants were no longer bound to look into the bill of lading, and had not constructive notice of its contents. There is a subsidiary position, that the plaintiff, having only a special property in the wheat, as a pledgee, could not commit it to the possession of Brown, as he was the general owner and pledgor of it, without losing that special property to a *bona fide* purchaser from him.

It is seen, at once, that the important thing, in this contention, is that Brown was the general owner of the wheat; for on the existence of that depend both the propositions put forth. We think that we have shown that the idea of a general ownership in him is not consistent with the facts of this case, nor with the rules of law declared in like or analogous cases. To be sure, by his order to Sears & Daw to purchase the

wheat for him, he set on foot a course of action, which if carried out to the end, in the manner proposed and intended by all the parties to it, would have vested in him the general and unqualified ownership. But he never had the power over the wheat of a general owner. There was never a time that he had such dominion of it, as that he had the right to enjoy or do with it as he pleased, even to spoiling or destroying it ; or that he had that right in it, by which it belonged to him in particular, to the exclusion of all others. To constitute ownership, in the sense of that phrase as here used, there must be, at some time, a right as ample and unrestricted as that. When that right once exists, he who has it is a general owner. He may then burthen or limit that right, or subject it to rights created by him in others, and cease not to be the general owner. But he has not become the general owner, though he may have an interest in the property, until he has a right as great as that stated above.

We are asked, would not the profit have been Brown's, had the wheat advanced in value, and the loss his, had it declined, or if it had been destroyed by fire ? To which the ready answer is, whatever had chanced to it, it would not have been his, as between him and Sears & Daw and the plaintiff, until he complied with the conditions on which it was bought for him, that is to say, had accepted and paid the draft. As soon as he paid the draft, it would have been his, with whatever enhancement of value. Had it lessened in value, or been burned up, he would still have been liable to Sears & Daw, for the price of their services and for their expenses, and to the plaintiff, first, on his promise to accept the draft, and after acceptance, on that obligation to pay it. This position is noticed in *Mirabita* v. *Imp. Ottoman Bank* (*supra*) ; and while holding that the shipper may retain a power over the goods, it is declared that the vendee has an interest in them, that they are at his risk, and that the loss or benefit to them is his. This particular matter is treated of in *Haille* v. *Smith* (1 Bos. & Puller, 563). There,

property was shipped by the owners of it, and the bill of lading indorsed in blank, and the invoice, were sent to a mercantile house, under a previous agreement that it should receive, and hold and sell the property, and apply the avails for the benefit of a banking house, to which the owners and consignors of the property were or were likely to be indebted. The point was there made that the risk was upon the consignors, up to the time of a sale, and that they had an insurable interest, and that they had a right to detain. The court held, that the bill of lading operated as a change of the property; that by reason of the agreement, from the moment that the goods were set apart for the particular purpose of securing the banking house, there was a change of property; but as it was a change of property for the purpose only of applying the proceeds by way of indemnity, the circumstances of the risk, and of the profit and loss, referred to the trust with which the property was charged, and were accounted for thereby; and that that trust being that the proceeds should be applicable to the debt of the banking house, the risk must remain with the consignors, notwithstanding the change of property, and the consignors must suffer or be benefited by the loss or profit upon the sale. It would seem that the principle thus announced is equally applicable to the facts in the case in hand, though they differ in some particulars. Here, the wheat is bought by Sears & Daw for Brown, but, on the instant, the property in it is, by the bill of lading, vested in the plaintiff, but as an indemnity, and charged with a trust that it be sold, if not paid for by Brown, and the avails applied to repay the advance made upon it. In analogy with the decision in the case cited, why is not the risk upon Brown, and the profit or the loss his, though he have not the property in the wheat? It cannot be successfully contended that, until Brown paid the draft, he could have maintained an action for the delivery of the wheat, had the plaintiff retained it. He could not have shown that he ever had right to possession, or right to the dominion over it, to the exclusion of all others. "So long as the advances

were not paid, there was no theory whereby" Brown "could claim title. It had never been in" him. "At the moment his interest, whatever it was, accrued, it came burdened with the formal ownership of the plaintiff." (*Bank of Toledo* v. *Shaw*, 61 N. Y., *supra.*) Had Sears & Daw advanced the money as factors, in compliance with the order of their principal and giving him credit, the purchase would have been for him at once, and he would, at the instant, have become the owner of the thing bought. But the facts are far otherwise, and must not be lost sight of. At the outset, as one of the first steps in the process, the legal title was lodged in the plaintiff, not to leave it until the payment by Brown of the draft.

Thus the case is kept out of the law governing the relations of pledgor and pledgee. The plaintiff was not a pledgee of the property of Brown. It had a right to it, not the qualified and special property of one holding, as a security, a chattel belonging to another. It had the legal title, under an agreement to transfer it on payment being made; it "held the title in trust for" Brown, "after its own claim was satisfied:" (61 N. Y. *supra.*) Nor does this conflict with *Williams* v. *Littlefield* (12 Wend., 362). There the factor or agent bought on terms more favorable than he exacted of the principals; the variation he made was a departure from instructions and from the course of former dealing. Here, all that was done was in accord with previous understanding.

Such, it seems to us, is the result of the adjudications in this country. The basis of the opinion, in 61 N. Y., *supra*, is that the legal title to the property was in the bank, as assignee of the bill of lading. It is well to notice here a distinction, that is attempted to be made, between the case just cited and the one in hand. It is said that there, there was an express agreement that the purchasing agent, or the discounting bank, should hold the property until the draft was paid. Such agreement was but putting into terms, the legal effect of the transaction in the case before us. For we

have shown, by authority, that the taking of the bill of lading in the name of the plaintiff, for its account, and the discount of the draft by it on the strength thereof, did transfer to it the title to the wheat. And in 61 N. Y., *supra*, the agreement between the agents and the bank was like that here, that the draft should be drawn on the principal, and that the bill of lading be taken in the name of the bank as security for the payment. *Dows* v. *National Exchange Bank* (91 U. S. Rep. [1 Otto], 618), stands upon the same footing. The outset of the opinion, in that case, states the only question to be, whether the ownership of the property had been divested before the conversion; and that the court has only to inquire to whom the wheat belonged when it came to the hands of Dows & Co. The opinion declares that the agents at Milwaukee, having purchased and paid for it with their own money, became the owners of it. This is placed upon the fact, that not being furnished with funds by their principals, they raised them in the way used by Sears & Daw. It is said, in argument before us, that the position just stated was conceded by the counsel in that case, and the inference is then made here, that it was assumed by that court as the law of that case, without consideration or deliberate judgment, or as necessarily applicable to every case of like facts. We think that the position is stated by the court as the law of that case and of every case showing the same facts, in that respect; though, as the proposition was not controverted by counsel, a bare statement was thought to be enough without discussion or elaboration. Nor is there meant by the term "ownership" only a special property, like that of a lienor or pledgee; it is put as "the absolute ownership," "the complete power of disposition." In this view, those cases are not applicable here which hold that a delivery to a vendee, even upon condition expressed at the time, will maintain a right in a *bona fide* purchaser from the vendee. *Smith* v. *Lynes* (5 N. Y., 41) is an example of such cases. *Ballard* v. *Burgett* (40 id., 314) and *Austin* v. *Dye* (46 id., 500), show the distinction which exists; and the same appears

in considering *Rawls* v. *Deshler* (3 Keyes, 572), and *M. and Trader's Bank* v. *F. and Mechanics' Bank* (60 N. Y., 40).

Hence there was no relation between the plaintiff and Brown of pledgee and pledgor ; and hence no giving up by it, as pledgee, of the possession of property, held by it in pledge, to him while the general owner of it. It is not therefore needed that we. consider whether, if such were the case, the special property or lien in it of the plaintiff was lost thereby.

Much stress is put upon the assumed fact that the right of the plaintiff in the wheat was a secret lien, and no more. Whether a lien merely, or an ownership, the declaration of the bill of lading, even with the modification thereof, made by the matter stamped upon it by the plaintiff, evinced to any one looking at it, that Brown had no right or authority to dispose of the wheat, until he had paid the draft. As it is conceded that possession merely, without title, in one assuming to sell, does not give title to his vendee, what is required of the vendee in such case, if it be not to examine the bill of lading or other evidence of title ? And here, an examination would have shown that Brown could not give good title. It is said that, as the carrier could properly make delivery to Brown, the entire functions of the bill of lading were exhausted, when the wheat was transferred from out the canal boat into the sea-going steamer. But that is not so, for by that transfer there was but a change of possession, and if possession merely did not give title, there was still something further to be looked for and required, and the terms of the bill of lading, even as modified, still stood in the way of a transfer of the absolute ownership of the wheat by Brown.

And we now come back to the elementary rule with which we started. It appears that there were infirmities in the title which the appellants got from Brown, or rather they got no title from him ; for there had never been a contract *de facto* which purported to pass the property from the owner to him. All that the appellants had, upon which they had a right to rely, was the fact of possession of the wheat by Brown,

and the purchase of it by them, in accordance with the usual course of business on the produce exchange. We doubt not that the latter makes very easy and rapid the transaction of an immense trade in the agricultural products of the country; and that it would tend much to the security and confidence with which it could be done, if the law of market *overt* could be applied to it. But such is not the rule of this State, in the sale of chattel property, and we may not declare it so to be. The purchaser buys at his risk of the title, and if he would be safe, must make inquiry. He may not, with certainty, stop at the fact of possession, but must learn how the possession has been acquired. In every such case as this, the muniments of a real title are easy to be produced. When the property is, in fact, in the carrier's hands, the bill of lading will show to whom alone he has the right to deliver it. And if the directions of that document are relied upon, there cannot be much risk. A reliance upon it, and a prior inspection of it, may delay transactions, but they will protect all innocent and well meaning parties, and thwart seriously only those who mean to do wrong or are too reckless to try to do right. The appellants were not protected by the fact of possession in Brown, because possession alone does not give the power to pass a valid title. Hence when they bought of him they got no greater right than he had in the wheat. This need not be amplified or enforced, for the appellants concede that possession alone is not such evidence of ownership, or authority to sell, as that third persons have a right, as against the true owner, to rely thereon.

The appellants offered to prove, on the trial, an established course of business in the trade between Buffalo and New York, in respect to transactions of the kind involved in this action. The court excluded the evidence, and the appellants excepted. We think that there was no error in that. The manner in which this transaction was to be carried out was determined by the papers which were made between the parties to it. If that manner differed from the established course of business, then that course was overridden by

them.   If it agreed with them, then evidence of it would neither make nor mar.

The judgment appealed from should be affirmed.

All concur, except RAPALLO, J., not voting.

Judgment affirmed.