JOSEPH CENTOLA and Others, Copartners, Doing Business under the Firm Name and Style of FRATELLI CENTOLA, Plaintiffs, *v.* ITALIAN DISCOUNT AND TRUST COMPANY, Defendant.

City Court of New York, New York County, December 21, 1929,

*Wechsler & Wechsler* [*Martin Wechsler* of counsel], for the plaintiffs.

*John J. Curtin* [*Donald P. McArthur* of counsel], for the defendant.

NOONAN, J.   At the close of the trial both parties moved for a directed verdict.   The plaintiffs are copartners, doing an export business in Italy and New York city.   The Union Food Products Company is also a copartnership, engaged in business in New York city in the importation of food products.   The defendant is a banking corporation, incorporated under the laws of New York State.   On August 29, 1925, the plaintiffs entered into a written contract in New York city with the Union Food Products Company whereby the plaintiffs agreed to sell and deliver to the Union Food Products Company a large quantity of Italian cheese, to be shipped from Naples, Italy, to New York city.   In the contract of sale it was provided that shipments were to be made f. o. b. Naples in two equal installments and that seventy per cent of the price of the cheese was to be paid for by a sixty-day sight draft drawn pursuant to an irrevocable letter of credit, and the balance of thirty per cent by a sixty-day acceptance after date of shipment. In order to pay the seventy per cent of the purchase price as provided by the contract, the Union Food Products Company procured from the defendant bank an irrevocable letter of credit, dated September 26, 1925, and addressed to the plaintiffs.   This letter of credit stated that it was issued at the request and for the account of the Union Food Products Company and authorized the plaintiffs to draw on the Banca Nazionale di Credito, a correspondent of the defendant bank at Naples, Italy, at sixty days' sight, for seventy per cent of the purchase price of the cheese.   It

also provided that any draft drawn under it must be accompanied by commercial and consular invoices, and a full set of bills of lading drawn to the order of the defendant bank, showing the merchandise actually received on board the steamer. The original of this letter of credit was sent by the defendant bank to the plaintiffs.

In the copy of the letter of credit retained by the defendant bank there was indorséd on the back of it an agreement signed by the Union Food Products Company, the parts thereof material to this controversy reading as follows: " I/we agree that the title to all property which shall be purchased or shipped under the said credit, the bills of lading thereof, the policies of insurance thereon and the whole of the proceeds thereof, shall be and remain in you until the payment of the bills referred to and of all sums that may be due or that may become due on said bills or otherwise, and until the payment of any and all other indebtedness and liability now existing or now or hereafter created or incurred by me/us to you on any and all other transactions now or hereafter had with you, with authority to take possession of the same and to dispose thereof at your discretion for your reimbursement as aforesaid, at public or private sale, without demand or notice, and to charge all expenses, including commission for sale and guarantee. This obligation is to continue in force and to be applicable to all transactions, notwithstanding any change in the composition of the firm or firms, parties to this contract or in the user of this credit. It is further understood and agreed in the event of any suspension, or failure, * * * or of the non-fulfillment of any obligation under saip credit issued by the Italian Discount & Trust Company on my/our account, or of any indebtedness or liability on my/our part to you, all obligations, acceptances, indebtedness and liabilities whatsoever, shall thereupon, at your option then or thereafter exercised, without notice, mature and become due and payable."

The plaintiffs knew nothing of this agreement made by the Union Food Products Company with the defendant, as the letter of credit sent to them did not contain a copy of the agreement. Under the letter of credit received by them the plaintiffs issued a draft on the correspondent of the defendant bank at Naples, Italy, for seventy per cent of the purchase price. The first shipment of one-half of the cheese was sent by steamer in September, 1925, and arrived in New York city. The Union Food Products Company accepted this shipment. This controversy concerns the second shipment, which reached New York city in the middle of January, 1926. On its arrival it was warehoused by the defendant bank in its own name for the account of the Union Food Products Company. The defendant bank, as was agreed, had received a

bill of lading for the shipment made out in its name, together with the seller's invoice and the consular invoice. Shortly before the arrival of the second shipment the plaintiffs received from the Union Food Products Company a letter dated January 14, 1926, stating that the shipment was rejected. No specific reason was given for the rejection. At that time, however, the Union Food Products Company was in financial difficulties. On receipt of the letter of rejection the plaintiffs through their attorneys, both orally and in writing, made a demand on the defendant bank for the return of the cheese to them. At the time of the written demand, made on January 27, 1926, the plaintiffs offered to the defendant bank " either to return the note representing said 70% advanced guarantee by you or its equivalent in cash, together with such lawful charges as you may have expended or incurred, and herewith demand the return of the merchandise to them." The defendant bank refused the offer. Thereafter, in the months of February and March, 1926, the defendant destroyed some of the cheese as unfit for sale and sold the remainder. Its position is that it was the owner of the cheese under the agreement for the issuance of the letter of credit made by it with the Union Food Products Company, and that it had the right to keep the merchandise to reimburse itself for the seventy per cent advanced on the cheese and for other indebtedness of the Union Food Products Company to it. At the time the demand was made on the bank for the return of the cheese to the plaintiffs the Union Food Products Company had become unable to pay its debts and there was owing to the bank on previous transactions a sum in excess of the sum realized on the sale of the cheese.

The question in this case arises between the sellers of the merchandise and the bank which issued the letter of credit through its European representative, and which is responsible for the payment of the draft drawn by the sellers in reliance thereon. The letter of credit was accepted by the plaintiffs as sellers, and upon its acceptance the bank obligated itself by contract to pay the sight draft drawn pursuant to it on presentation of the documents specified in the letter of credit. (*O'Meara Co.* v. *National Park Bank of New York*, 239 N. Y. 386.) A sixty-day draft was drawn by the sellers upon the European representative of the bank and was accepted by the latter. Such draft was accompanied by the documents specified in the letter of credit. The invoices and bill of lading were drawn to the order of the bank, as required by the letter of credit. The merchandise was shipped on board a steamer at Naples, Italy, and upon arrival in New York was warehoused by the defendant bank. The contract for a sale thereupon became

a completed sale. To provide the letter of credit called for by the sale agreement, the buyers entered into a contract with the bank, which was indorsed upon the back of the copy of the letter of credit retained by the bank. In this indemnity agreement between the buyers and the bank, the latter agreed to advance seventy per cent of the sale price of the merchandise by the issuance of the letter of credit to the sellers.

In consideration of this undertaking of the bank the buyers agreed to put the bank in funds one day previous to the maturity of the draft drawn in virtue of the letter of credit to meet the payment of the draft. The buyers further agreed that title to the merchandise purchased was to be taken by the bank as security for its advance on the credit of the merchandise and in addition as security for the payment by the buyers of all other indebtedness of the buyers to the bank, whether such indebtedness was existing at the time of the issuance of the letter of credit or arose subsequently. The buyers also agreed that, if they became unable to meet their obigations, the bank had the option to declare all unmatured obligations of the buyers as due and payable. This agreement between the buyers and the bank gave the latter an effective protection for the advance made by the bank. At the time the sellers made a demand on the bank for the delivery of the merchandise the draft drawn by the sellers, although accepted by the bank's European correspondent, had not as yet matured. If there were no other indebtedness owing to the bank by the buyers at the time of the sellers' demand, the bank would have been obliged to surrender the merchandise to the sellers upon the receipt of the seventy per cent of the sale price advanced by it and its other expenses. This would be so, although no contractual relation existed between the bank and the sellers with respect to the sale agreement. (1 Williston Sales [2d ed.], § 286, p. 654.) The bank, however, claimed the right under its agreement with the buyers to retain title to the merchandise until the payment by the buyers of their other indebtedness to the bank. Acting on this claimed right the bank refused the demand of the sellers, and in order to reimburse itself for this indebtedness owed to it by the buyers sold the larger part of the merchandise in February and March, 1926, after destroying thirty-three cases of cheese as unmerchantable and unfit for sale. The evidence discloses that the buyers had numerous transactions with the bank and owed to it considerable sums of money on loans and letters of credit. At the time of the issuance of the letter of credit on September 26, 1925, the buyers were indebted to the bank in a large sum of money secured by collateral. This was an indebtedness existing at the

time of the issuance of the letter of credit, and undoubtedly within the terms of the indemnity agreement between the buyers and the bank. The evidence does not clearly establish that this indebtedness was ever fully paid by the buyers. The evidence clearly shows, however, that at the time the sellers made their demand upon the bank the buyers owed the bank a large sum of money. After disposal of the merchandise in question and the other collateral held by the bank, there remained. unpaid by the buyers to the bank on the account between them the sum of $740, which was charged up by the bank as a loss.

The right of a bank to agree with its customer to take title to merchandise purchased by its customer, as security for the payment to the bank by the customer of the moneys advanced by the bank in the purchase of the merchandise, is settled beyond question. The bank becomes the owner of the merchandise with all the rights of ownership until the payment of the advance by the customer. Upon payment of the advance the bank is under a duty to deliver the merchandise to the customer or the customer's designee. The beneficial ownership of the buyer is transmuted into actual ownership upon the performance of the stated condition. (1 Williston Sales [2d ed.], § 286, pp. 650–652; *Farmers' & Mechanics' Nat. Bank of Buffalo* v. *Logan,* 74 N. Y. 568; *Moors* v. *Kidder,* 106 id. 32.) The title given to the bank as a protection for the advance made by it is a qualified one and has been called a security ownership. (*Drexel* v. *Pease,* 133 N. Y. 129, 136.) The bank may also contract with its customer to take title to the merchandise as security for the payment of additional indebtedness of the buyer not arising under the specific agreement. (*Drexel* v. *Pease, supra; Sugarland Industries* v. *Old Colony Trust Co.,* [C. C. A.] 6 F. [2d] 203; *Vaughan* v. *Massachusetts Hide Corporation,* [D. C.] 209 Fed. 667; *New Haven Wire Co. Cases,* 57 Conn. 352.) This last-mentioned security has been said to give the bank a general lien on the merchandise. In *Drexel* v. *Pease* (*supra,* 139) the court said: " There is no doubt of the validity of the agreement for a general lien, as between the parties to it." The indemnity agreement between the bank and the buyers in the case at bar authorized the bank to retain title to the merchandise even after the payment by the buyers of the specific advance of seventy per cent of the sale price, so as to secure itself for the payment of other matured indebtedness of the buyers. At the time the sellers made their demand upon the bank the title to the merchandise had passed from them. Provided they were paid seventy per. cent of the sale price the sellers had agreed to give credit to the buyers for the remaining thirty per cent. By the loss of possession of

the merchandise the sellers had forfeited their right to a vendor's lien. (*Rummell* v. *Blanchard*, 216 N. Y. 348, 354.)

The only recourse the sellers had under their contract of sale was to sue the buyers for the balance of the contract price.

The sellers admit that the bank had the right to keep the merchandise until the payment of the specific advance of seventy per cent but they contend that in the absence of notice to them of the agreement between the bank and the buyers for a general lien to cover other indebtedness of the buyers the bank was obliged to surrender the merchandise upon an offer by the sellers to make it whole on its specific advance. What rights of the sellers could be violated by the agreement for a general lien? The sellers say that it interfered with their right of rescission upon rejection of the merchandise by the buyers. But this right of rescission arose long subsequent to the agreement between the buyers and the bank. It is regarded as settled law that the contract between the bank and its customer is a separate and distinct contract from that between the customer and his vendor. (*Lamborn* v. *Lake Shore Banking & Trust Co.*, 196 App. Div. 504; affd., 231 N. Y. 616; *Laudisi* v. *American Exchange Nat. Bank*, 239 id. 234, 243; *O'Meara Co.* v. *National Park Bank of New York*, Id. 386, 395.) If the sellers desired to restrict the right of the buyers to contract with the bank for a general lien on the merchandise, they should have been careful to so provide in the contract of sale. The contract of sale called for a letter of credit as a means of payment in part for the merchandise. As to the manner in which this letter of credit was to be procured by the buyers, and what the character of the agreement for its procurement might be, the contract of sale was silent. The fact that the sellers did not wait for their draft against the bank to mature, but offered to return the draft before its due date, should not alter the rights of the bank to claim a general lien on the merchandise. If the draft had been presented and paid the bank could have retained title to the merchandise until it was reimbursed for its advance and for other indebtedness of the buyers then owing to it. (*Sugarland Industries* v. *Old Colony Trust Co., supra; Vaughan* v. *Massachusetts Hide Corporation, supra.*) By a parity of reasoning it seems to me that at the time of the sellers' offer to return the draft and to pay the other expenses of the bank, the bank could have retained the merchandise until it was paid the additional indebtedness of the buyers. The sellers stress the point that the sole ground upon which the bank refused their offer of reimbursement was the announced declaration of the bank that it was the owner of the merchandise. It is claimed that the only reason which could have

justified the bank's position was the agreement between it and the buyers for a general lien. The reason given by the bank for its refusal to surrender the merchandise was factually sound. In my opinion the bank was under no duty to state to their sellers their right of general lien. The contract between the bank and the sellers, as expressed in the letter of credit, called for no such obligation of the sellers. It would be difficult to conceive that the sellers would be willing, if the fact was made known to them, to pay the other indebtedness of the buyers to the bank in addition to the payment of the seventy per cent in order to obtain a release of the merchandise.

The case of *Drexel* v. *Pease* (*supra*), relied upon by the plaintiffs, is not analogous to the present case. In that case a proceeding was instituted in equity against a receiver, who held the proceeds of the sale of a quantity of sardines. The contest there was between a partner in the purchase of the merchandise and certain bankers who had a general lien on the goods. Pease and one other were jointly interested in the merchandise, each having advanced a part of its cost towards its purchase. The court held that as between the bankers who had advanced to Pease his share of the cost under an agreement by which the bank was secured for this advance and other indebtedness of Pease, and the co-owner of the merchandise, the general lien of the bank for the other indebtedness of Pease would have to yield to the equitable ownership of the partner of Pease.

In the case at bar the entire beneficial ownership was in the buyers, and the title to the entire merchandise was given to the bank. The distinction between the two cases is very clearly brought out in *Sugarland Industries* v. *Old Colony Trust Co.* (6 F. [2d] 209.) The plaintiffs further contend that the question now before the court has already been decided. It seems that a motion was made at Special Term by the defendant to dismiss the complaint. The motion was denied, and on appeal to the Appellate Term this decision was affirmed, without opinion. The right of the defendant bank to retain title to the merchandise until the payment of the other indebtedness of the buyers was a matter of defense. The complaint necessarily presented no question of the defense on the merits. The allegations of the complaint, so far as they went, alleged a cause of action. The affirmance of the Appellate Term simply meant, in my opinion, that the parties should proceed to trial and there litigate the merits of the defense.

For the reasons stated a verdict is directed in favor of the defendant, with an exception to the plaintiffs. Thirty days' stay and sixty days to make a case.