# The New Haven Wire Company Cases.

New Haven Co., June T., 1888. ·PARK, C. J., CARPENTER, PARDEE,
LOOMIS and BEARDSLEY, Js.

When a commercial correspondent advances money for the purchase of
property and takes possession of it, either actual or symbolical, he be-
comes the owner of it, although the advancement was made and the
property purchased at the request and for the ultimate use and profit
of another, and there is an agreement to transfer title to that other
upon the performance of certain conditions and the ownership was
taken solely for the protection of the advancement.

An agreement for a conditional sale, in the absence of fraud, is valid, as
well against third persons as against the parties ; and this although
the delivery is accompanied by permission to sell the property or that
of the original vendor and hold the proceeds for him. And the con-
dition may be not only that the vendee shall pay the price of the prop-
erty, but any other indebtedness of his to the vendor. To the validity
of the transaction it is only requisite that it shall be one of good faith,
and not a cover for a pledge.

The New Haven Wire Co., a manufacturing corporation of this state, de-
siring to buy iron rods in Germany for conversion into wire at its
factory here, made an arrangement with B & Co., bankers and com-
mercial correspondents in England, under which it was to draw upon
them, upon time, and upon certain conditions, for the cost of the rods;
and in consideration of their agreement to accept such drafts, the Wire
Co. executed a written agreement to pay them a commission, and to
furnish sufficient funds in London to meet the payment of the bills,
and that all rods and the proceeds thereof for the cost of which bills
should be drawn, should, with the bills of lading, be and were sold
and transferred to B & Co. (subject to its right to acquire title to the
same by complete performance of its contract) as collateral security for
the payment of the particular bills drawn therefor and of any other
sums which might, at the time of making such payment, be owing by
the Wire Co. to B & Co. A bill of lading and a consular invoice of
each lot of rods, when shipped from Germany to New York, were
taken in the name or to the order of B & Co. and delivered to them.
They then accepted for the cost, and the Wire Co. sold the acceptance
and paid for the rods with the proceeds. Held that B & Co. became
the absolute owners, with possession, of each lot of rods on shipboard,
under an agreement to sell and deliver them to the Wire Co. on per-
formance by it of the stipulated conditions.

When a particular lot of rods arrived in New York B & Co. delivered the
bill of lading and the consular invoice to the Wire Co., upon the de-
livery by it to them of a written receipt therefor, in which it ac-

knowledged that it received the rods from B & Co. and agreed to hold them in trust for them and as their property and subject to their order; with liberty however to sell the same, provided that in case of sale it should forthwith account for and pay over the proceeds to B & Co.; which it agreed to do; such proceeds to belong to them and not to it, and the rods to be held for them as security under the terms of the agreement executed by it in consideration of the granting of the letter of credit by B & Co. Held, there being no claim of fraud, that the transaction was a sale and delivery of a specified lot of rods to the Wire Co., upon condition precedent that it should repay to B & Co. the amount of the acceptance which imported that particular lot of rods, together with all other sums which, at the time of payment of such acceptance, should be actually due from and payable by it to B & Co.; and that B & Co. continued to be the absolute owners of such rods until the Wire Co. should acquire title by full performance of these conditions.

Held also, that if the Wire Co. exercised its power to sell rods thus conditionally placed in its possession before acquiring absolute ownership, the purchaser acquired title even if he had knowledge of the condition. Also that if, before acquiring absolute title, the Wire Co. converted the rods into wire and sold the same, and neglected to pay over the proceeds to B & Co., and mingled the same undistinguishably with and used them as its own money, B & Co. became its creditors for the several amounts, without lien or priority.

In the month of June the Wire Co. procured, through the credit of B & Co. under the arrangement before stated, certain specified lots of rods upon the same conditions, the aceptance importing which fell due in August following. In July the Wire Co. received through the credit of B & Co. other specified lots of rods, upon similar conditions, with leave to sell the same as the property of B & Co.; the proceeds to be immediately paid over to them. In the same month the Wire Co. sold the same and mingled the proceeds with and used them as their own funds. In August the Wire Co. paid the acceptances importing the rods delivered to it in June, but did not pay B & Co. the money received by it for the rods sold in July. Held that there was a matured indebtedness from the Wire Co. to B & Co. by reason of the receipt and retention of the money in July, the omission to pay which in August prevented it from acquiring title to the rods delivered to it in June by paying the acceptance importing them.

The New York Wire Spring Co. was organized as a corporation under the laws of this state in 1884, some time after the organization of the New Haven Wire Co. The latter company subscribed for and held half its capital stock through a trustee who was the secretary and a director of both corporations; the rest of the stock was held by two individuals. No cash was paid upon the subscriptions; checks were deposited with its treasurer for twenty per cent. thereof, but were never paid. No advertisement was published and no certificate of its organization, as required by law, was filed with either the town clerk or the secretary of the state until June, 1885. In the meantime some business was trans-

acted in the name of the corporation. It was found that the organization was made in good faith, in the belief that it could profitably manufacture goods differing from those made by the Wire Co. In June, 1885, the Wire Co. received, through the credit of B. & Co., a certain lot of rods under the arrangement and upon the conditions before stated, the Wire Co. to have the right to sell the rods as the property of B & Co., paying over the proceeds to them as soon as received. The Wire Co. sold this lot of rods to the Wire Spring Co. At the time of the sale the rods were, and after it remained, in the possession of custom house officials, held for the payment of a duty thereon. Held—

1. That if the Wire Spring Co. was not a legal corporation the members composing it became a partnership under that name, having no identity with the Wire Co. and capable of contracting with it, and that the sale, being made in good faith, was therefore a valid one.

2. That a change of the location of the rods was not necessary to make the sale good as to creditors.

3. But that, the sale being valid between the parties, no delivery was necessary as against B & Co., because they were not claiming in their character as creditors of the Wire Co. but as owners of the rods.

4. That the receiver of the Wire Co. could not attack the sale in behalf of the creditors of the Wire Co. on the ground of retention of possession, because the sale was not of its own property by the Wire Co., but of the property of B & Co. which it was authorized to sell.

Other foreign bankers and commercial correspondents had in the same manner by their credit procured for the Wire Co. iron rods of the same description as those procured through the credit of B & Co., during the same period and upon like conditions, which were in its possession unsold at its insolvency, and went into the hands of the receiver and were claimed by him. The bankers severally brought suit for the recovery of the rods to which they were entitled. There were not enough to satisfy the claims of all; there were no marks by which the several ownerships could be determined, and the Wire Co. had mingled them in confusion, while no claimant was able to make proof as to the amount of his contribution to the mass. Held that, as the cases stood, no judgment could be rendered in favor of any one claimant, as against the others, for a portion of the rods.

The receiver of an insolvent corporation represents creditors in the same manner as a trustee in insolvency.

[Argued June 18th—decided December 31st, 1888.]

APPLICATIONS of sundry bankers and commercial correspondents to the Superior Court in New Haven County, for orders compelling the receiver of the New Haven Wire Company, an insolvent corporation, to surrender to the applicants their several portions of a large quantity of wire rods, which he held as the property of the corporation, and of which

they claimed to be the owners. The applicants were Baring Brothers & Co. of London, England, and Kidder, Peabody & Co. of New York, their American agents; Brown Brothers & Co. of New York and Brown, Shipley & Co. of Liverpool, their English correspondents; and Heidelbach, Ickelheimer & Co. of New York. The cases, involving the same general facts, were heard together before a committee and a general finding of the facts made, and the cases were reserved upon the facts so found for the advice of this court. The facts are fully stated in the opinion. The cases were argued together in this court.

*C. R. Ingersoll* and *H. Stoddard*, with whom was *J. W. Bristol*, for Baring Brothers & Co. and Kidder, Peabody & Co.

*S. E. Baldwin* and *H. G. Newton*, with whom was *C. Kleiner*, for Brown Brothers & Co. and Brown, Shipley & Co.

*J. T. Platt* and *J. T. Moran*, for Heidelbach, Ickelheimer & Co.

*J. W. Alling* and *H. C. White*, for the receiver.

There is nothing difficult, we conceive, in the legal principles by which these cases must be determined, and we feel confident that all difficulties will vanish if the facts are clearly understood.

The New Haven Wire Co. carried on a very extensive business in the manufacture and sale of wire. For that purpose it had a suitable yard, mill and wharf, and other facilities in New Haven. Nineteen twentieths of the raw material used by it consisted of wire rods bought in Europe and imported to this country by the company. The property claimed by the applicants consists chiefly of rods found in its yard at the time of its failure.

In order to buy the rods in Europe, as in all its business, the company, being a corporation, acted by its agents. It

employed Wheeler & Humphreys, (usually referred to as E. S. Wheeler & Co. of Liverpool,) a firm of brokers, doing business in Liverpool, England, to buy the rods, and paid them a commission for their services. Wheeler was the president of the Wire Co. and the principal owner of its stock. The company's credit was very good, and in order to supply its agent at Liverpool with the cash to pay for the rods, it went to the present applicants, who were engaged in international banking and exchange, and procured from them an agreement that their English correspondents would accept drafts to be drawn on them by the Liverpool agents of the Wire Co. for such sums as would pay for the goods it might purchase in Europe, through its agents, not exceeding in the whole certain limits agreed upon ; and the Wire Co. agreed that it would deposit with them in New York, fifteen days before the maturity of the English draft, sufficient money to meet it. In other words, the Wire Co. agreed that the English bankers should be put in funds to pay the drafts at their maturity, and all that the New York or English bankers expected to give to the company was their financial credit. For their services they charged a commission, varying according to the length of time of the draft. They well understood that the Wire Co. was a Connecticut corporation, engaged in manufacturing and selling wire, and was importing these rods for the purpose of taking them to its manufactory in New Haven, there to make them up into wire, and to sell the wire in the markets of the country; that E. S. Wheeler & Co. of Liverpool were its agents to buy the rods, and were expected to draw on the English bankers for such sums as they would require to pay cash for the rods, and to sell the drafts, after acceptance, in the money markets of England, and from the proceeds of the drafts to pay for the rods. A draft accepted by any of these bankers was as good as a certified check on the Bank of England. As security for any loss the bankers might incur and for the discharge by the Wire Co. of its obligation to meet the drafts as they matured, they required

certain stipulations to be entered into by the Wire Co., and the principal question at issue concerns these stipulations.

It is to be noticed with regard to all these contracts, (1st) that there is nowhere a suggestion that the bankers claim under a right or title, or to protect any right or title, of the foreign manufacturer of the rods; but in each case it is understood that the title of the foreign manufacturer has gone *to the Wire Co.* and has been pledged by it to the bankers. (2d) That there is nowhere any suggestion that the bankers have any right or title to the goods, under any doubtful right or interest therein which the Liverpool agents of the Wire Co. might perhaps claim. The contracts always assume that the Liverpool agents have *not* the title, and such was the understanding between the Wire Co. and the bankers. The Wire Co. undertook to supply its Liverpool agents with funds, without giving them any title, right or interest in the goods to be bought, and these agents were entirely satisfied with the arrangement. As the Liverpool agents always paid the foreign manufacturer cash, they were under no obligation to him, nor had he afterward any interest in the property. Now how can a court, without doing violence to the fundamental principle of dealing in equal fairness with all persons, relieve these bankers from standing in that precise relation to these goods in which they agreed with the Wire Co. to stand, in written contracts, prepared by themselves according to their own choice and will, and with reference to which surprise, fraud or mistake is not even claimed by them?

And how can it be claimed that these contracts give them anything more than a title to or interest in the goods by way of mortgage, pledge or hypothecation as collateral security for the performance of the agreement of the Wire Co.? Where is there the slightest ground for claiming that these contracts ever gave them the position of " vendors of these goods under a contract to sell and deliver?"

Let us look at the terms of the contract with Brown Brothers & Co. They issued a letter of credit addressed to themselves by the name of Brown, Shipley & Co. of Liv-

erpool. This letter of credit, so addressed, was delivered to the Wire Co., to be by it forwarded to its Liverpool agents. It therefore had knowledge of its terms. The theory of this letter of credit was that goods would be placed with Brown, Shipley & Co. at Liverpool, for shipment to New York to the shipper's order, (which really meant a bill of lading indorsed in blank,) or if goods were not so placed with Brown, Shipley & Co. at Liverpool, but were shipped from some other port, then the bills of lading were to be placed with Brown, Shipley & Co. As a matter of fact Brown, Shipley & Co. never shipped any goods in their own name as consignors. The bills of lading were always made out as if E. S. Wheeler & Co. of Liverpool, were the shippers, and were "unto order," and were indorsed in blank by E. S. Wheeler & Co., and then placed with Brown, Shipley & Co.

But the vital question is, *who* placed the goods or bill of lading with Brown, Shipley & Co.? The bills of lading were to be sent "through" Brown Brothers & Co.; that is, to be under their control until they should pass them over to the party who bought the goods. Upon the receipt of them Brown, Shipley & Co. were directed to accept drafts, drawn by the authorized agents of the Wire Co. and on its account. For their reimbursement Brown, Shipley & Co. were required to draw on the Wire Co., in such a manner that the draft would fall due fifteen days before the maturity of the English draft. Then the Wire Co. entered into a written agreement with Brown Brothers & Co. to accept the drafts of Brown, Shipley & Co., or those of Brown Brothers & Co., and for the purposes of securing the payment of such acceptances, the Wire Co. agreed with them as follows :—(1st) "To give you satisfactory security for their payment, if required." (2d) "And *we* hereby give you a *specific claim and lien* on all goods and the proceeds thereof, for which Brown, Shipley & Co. may come under any engagements in virtue of this credit, on all *policies of insurance* on such goods, and on all *bills of lading for the same*, with full power and authority to take possession and dispose of them at discretion, and to charge all expenses,

including commissions for sale and guarantee. And *we* further pledge to you said goods and the proceeds thereof, as security for any *other* indebtedness of ours to you."

It should be noted here that these applicants have unmistakably written themselves down as pledgees. However much the exigences of their present position may require them to claim the rights of general ownership and to be conditional vendors of the property to the Wire Co., their contract claims for them only the rights of pledgees. Besides, the law favors the conclusion that the transaction is a pledge, rather than a mortgage. Jones on Pledges, § 14. Whatever be the form of words used, when the title is admitted to be held as collateral security, no jugglery of words can cause, between the parties, the general ownership to be in the creditor, so that he can become a conditional vendor, and leave in the debtor only an obligation to pay his debt, and no ownership in the property. We particularly observe that it is from the *Wire Co. alone* that all the "claim or lien," whether "specific" or otherwise, of Brown Brothers & Co. to the property, *policies of insurance* or *bills of lading,* is derived. How could the Wire Co. assign to Brown Brothers & Co. the policies of insurance, unless it owned the goods and could insure them? How could it assign the bills of lading, unless the goods were its own? The use of the word "lien" unmistakably implies an interest in the property as security for the discharge of an obligation, and this is confirmed by the power "to charge all expenses of sale" to the Wire Co. in case of sale, and by the "further pledge" of the goods as "*security* for any *other* indebtedness."

Clearly the applicants are estopped from taking any other relation to these goods than that defined in their contracts with the Wire Co. The latter entered into an extensive business with them on the faith that these contracts were the complete, full measure of all the title or interest in the goods that the applicants desired to claim. So long as the fundamental contract between the bankers and the importer is, that the banker only lends the money or credit and that the importer owes the debt; that all the risk of the venture

is on the importer, all the profit his, and only the commission or interest to belong to the banker; and so long as the actual course of business under the contract is governed by this fundamental relation—it will be strange, at least in Connecticut, in case of the insolvency of the real purchaser, if the rights of unsecured creditors, who never were parties to the mere form of words forced upon the importer by the banker, are to yield, and to be sacrificed to what, as between the parties, was nothing but a lien, secret at best, and in contravention of the often declared policy of the state.

It will be claimed that the transfers of the bills of lading operated to create and transfer a title greater than that of a mortgage or pledge; and that, too, in the face of the contracts, which provide only that the bills of lading are to be transferred in the aid of a title as security. But a bill of lading is nothing but a carrier's receipt for the goods and contract to carry them. There are no apt words in it anywhere to convey any title whatever, and the transfer of it, of itself, is nothing more than the transfer of the carrier's receipt and contract. It may be handed to the clerk or to the truckman of the transferrer, and it may be transferred to a purchaser of the property. The meaning of the transfer, so far as the question of title is concerned, always depends upon the *contract concerning the property*, which is *other* and *different* from anything expressed in the bill of lading. It is only a transfer of a right to take *possession* of the property, and of itself has nothing to do with the transfer of the *title* to the property. As goods in transit are not in the corporal possession of the owner, mortgagee, pledgee, or vendee, the holding or transfer of the bill of lading is the symbolical possession or transfer of possession of the property, and nothing more. Jones on Pledges, § 230; 2 Daniels on Neg. Inst., §§ 1731, 1731a.

The next question is, whether the applicants did surrender the possession of the goods to the Wire Co. It is admitted, that the property was delivered to the Wire Co.; that it brought the goods to its manufactory; that it thereupon used the goods as if they were its absolute property; and

that there was no indication on the premises, or on its books, that the applicants " claimed the ownership, or any lien, upon any of the imported rods." The only evidence of the claims of the applicants was in certain documents called " trust receipts," made by the Wire Co. in New Haven, and sent to and held by the applicants in New York. Let us examine the trust receipt of Brown Brothers & Co., which is essentially the same as that of the other applicants. It says that the New Haven Wire Co. have " received from Brown Brothers and Co." "the merchandise specified in the bill of lading," " and in consideration of " said receipt, the company " agree to hold said goods in trust, with liberty to sell the same, and in case of sale to hand the avails as soon as received to Brown Brothers & Co., *as security* for due provision for the acceptances of Brown, Shipley & Co. ; " and the Wire Co. " further *pledge* to " Brown Brothers & Co. the " goods, and the proceeds thereof, *as security* for the payment of any other indebtedness " of the Wire Co. " to Brown, Shipley & Co. ; " and the Wire Co. " further agrees to keep said property insured against fire, payable in case of loss to Brown Brothers & Co., with the understanding that they are not to be chargeable with any expenses incurred thereon ; *the intention of this arrangement being to protect and preserve unimpaired the* LIEN *of Brown Brothers & Co. on said property.*"

It is to be noted that what the " trust " is, is not mentioned in terms ; we have the word " trust," and nothing more.

But the intent of this paper is expressed " to protect and preserve unimpaired the lien " on the property. As between unsecured creditors and the bankers, whether their lien was preserved or not depends upon the law of the land, and not upon a contract to which the creditors were not parties. Here again Brown Brothers & Co. are unequivocally claiming only a "lien" and "pledge." This implies that the general ownership is in another, and that the lien is for the security of the performance of a contract by some other person. Since the only contract Brown Brothers & Co. ever had with reference to this property was with the Wire Co., and since no other person than the Wire Co. was claiming any

interest whatever in the property, it follows, as matter of course, that this receipt recognizes the general ownership of the goods to be in the Wire Co., subject to a lien in favor of Brown Brothers & Co.

The applicants can never hold these goods under Connecticut law unless they can prove that they are the general owners. If they are the general owners, they must show from whom they derived their title. The contracts upon which their entire claim rests conclusively demonstrate that they did not get their title from any one other than the Wire Co. And we submit that the idea that the applicants derived the general ownership from the Wire Co. is absolutely inconsistent with the letter of these contracts, and still more inconsistent with their real meaning and true spirit.

If we are right in our argument up to this point it disposes of all the questions in each case. But it may be held that the lien of the applicants did survive the surrender of possession, and is valid against the company's creditors, and therefore the *extent* of the lien must be discussed.

At the time of the failure there were certain acceptances on their way to maturity. All due previous to the failure had been promptly paid. The goods pledged for the maturing acceptances had arrived in this country and been surrendered to the company and trust receipts given therefor; and had been sold in part by the company and the rest taken to their manufactory, where a great part of them had been manufactured into wire and sold, or was either in process of or the product of manufacture. The rods pledged for the maturing acceptances, so far as they were in process of manufacture or had been manufactured, were utterly incapable of identification or separation from other property in like condition, and it was impossible to find out what portion of such pledged rods as had gone into the mill had passed into wire and been sold, and what had not so passed. The applicants could not find, therefore, all the rods that were pledged for their unsecured acceptances, and they seek to subject other rods, found on the premises of the company, to a lien for their payment. Such other rods had once

been pledged for acceptances which had been paid, and the question is, whether any invoice of rods was in fact pledged for any other than the one acceptance, lent to the Wire Co., from the sale of which it raised the money to pay the original owner for that quantity of rods. The applicants claim that all the transactions with each banker during the whole course of business are a unit; and that any rods in the possession of the company, no matter when bought, if they were bought from the proceeds of one of these acceptances, and can be so identified, remain pledged for the payment of any and all acceptances, even the last one maturing. Inasmuch as the lien, if it continues to exist on such old rods, must also logically exist on the proceeds of such old rods as had been sold, the result of this claim would be that rods or their proceeds to the amount of $600,000, in each of the cases of Kidder, Peabody & Co., and of ·Brown Brothers & Co., and to the amount of $160,000 in the case of Heidelbach, Ickelheimer & Co., would stand charged with the payment of these maturing acceptances.

Another theory relied upon by Kidder, Peabody & Co. is that all the transactions connected with a single letter of credit are a unit. These letters of credit were either £5,000 or £10,000—more often the latter. After payment of the duties and the cost of manufacture, the value of the material bought by the money obtained on these letters of credit would at least be $50,000 on the £5,000 credit, and $100,000 on the £10,000 credit. And the argument under each of these claims would come to this, that the first acceptance would be secured *only* by the goods pledged against it, while the last acceptance would be secured by $600,000 worth of goods, or by goods of the value of from $50,000 to $100,000.

In regard to the claim of lien under the Brown contracts, we say that it is plain from the terms of those contracts that at the time of the failure there was no such lien, even as between the parties, for the goods were once free from all liens, and a new lien cannot be imposed without a new act of the parties. And that if there was at the time of the failure such

lien on other goods, as between the parties, it was void as to creditors by reason of want of possession to support it, and by reason of its uncertainty and indefiniteness. As to the latter point see *Ives* v. *Stone*, 51 Conn., 446.

Passing now to another line of argument, we find that the leading case in support of the applicants' claims is *Moors* v. *Kidder*, 106 N. York, 32. All other cases which they will cite to the same effect can either be clearly distinguished from it, like *Moors* v. *Wyman*, 146 Mass., 60, or will be found to be but echoes of it. That case is based upon the law developed in a series of decisions, the most important of which are the following : *Bank of Rochester* v. *Jones*, 4 N. York, 497 ; *City Bank* v. *Rome &c. R. R. Co.*, 44 id., 136 ; *Merchants & Traders' Bank* v. *Farmers & Mechanics' Bank*, 60 id., 40 ; *Bank of Toledo* v. *Shaw*, 61 id., 283 ; *Marine Bank* v. *Fiske*, 71 id., 353 ; *Farmers & Mechanics' Bank* v. *Logan*, 74 id., 568; *Same* v. *Hazeltine*, 78 id., 104; *Hazard* v. *Fiske*, 83 id., 287 ; *Dows* v. *Kidder*, 84 id., 121 ; *De Wolf* v. *Gardner*, 12 Cush., 19 ; *Forbes* v. *Boston & Lowell R. R. Co.*, 133 Mass., 154; *Dows* v. *Nat. Exchange Bank*, 91 U. S. R., 618. These cases are all connected with the shipment of grain from the interior to the Atlantic seaports. The grain is usually purchased by a western dealer with funds procured on his own credit, and consigned to some party in an eastern city. For his reimbursement the western dealer draws on the consignee, and procures the discount of the draft by giving the bill of lading to the discounting bank as security for the acceptance and payment of the draft. The decisions allow the discounting bank to follow the grain even into the hands of *bonâ fide* purchasers, on the theory that the western dealer, who is the general owner, gives the bank a special property in the grain as security for its advances, and intrusts the bank with the constructive possession by the delivery of the bill of lading, which is a muniment of title whose contents any person dealing with the grain is bound to know, and that the bank cannot be divested of its interest in the grain until its advances are repaid, provided that it uses due dili-

gence in maintaining its interest and performing its contract with the general owner.

The decision in *Moors* v. *Kidder* rests upon the idea that the banker furnishing the credit becomes the general owner of all goods transported by means of such credit, and concedes that if Kidder had had only a pledgee's interest he could not have recovered. It is believed that this idea is not borne out by the line of decisions referred to, and that the main current of authority goes only to the extent of saying that when a banker advances money against goods and takes the bill of lading as security, he acquires only such an interest as the nature of the case, the contracts of the parties, and their situation, show he was intended to acquire. In all cases he takes from the party to whom he makes the advances, and from whom he receives the bill of lading, a special title by way of security—a banker's title—and so far as concerns the party surrendering the bill of lading, the banker's relations to the property must always remain the same until he is paid. As to all *other* parties, who are in reality strangers to the property, even as to the intended purchaser, to whom no advance has been made, and who has not yet obtained any interest in the goods, the banker has, necessarily, the rights of the general owner in the goods because he is the general owner's representative. And no case prior to *Moors* v. *Kidder* will be found to conflict with this position. In all these cases it will be noticed that the general owner, or original pledgor, never appears as a party, but that in every instance the issue is between the original pledgee and a third party who has attempted to acquire a property in the grain from some one who could not give a good title. The fact that, as between the western dealer who buys the grain and the bank which makes the advances, the bank takes only a pledgee's interest, is made clear in two of the more recent cases referred to. In *Marine Bank* v. *Fiske*, 71 N. York, 353, the court say in a unanimous opinion: "The plaintiff was the *pledgee and special owner* of the wheat and in possession thereof. * * * The *general owner* had not the possession." And again in *Hazard* v.

*Fiske*, 83 N. York, 294, the last important case covering the exact point, the same court say in a unanimous opinion, "It must be remembered that Nims was the owner and that the plaintiffs [the bankers] had only a lien for their advances." In the case of *Moors* v. *Kidder*, three of the seven judges refused to subscribe to the doctrine of the majority of the court.

Again, the nature of the bank's interest or title in the pledged grain appears from the relation of the parties. It is too clear for argument that the delivery of the bill of lading, even when it contains the name of the party receiving it, can in no case confer a greater interest or title than would be conferred by the delivery of the goods. The goods, or the bill of lading, may be delivered to a vendee, a mortgagee, a pledgee, an agent, or to one standing in some other relation to the party handing over the bill, and the interest of the party receiving the bill of goods will be determined by the contract of the parties in relation to the same. The *intent of the parties* is the controlling fact in the transaction. Now, in dealing with the grain in the foregoing cases, the western dealer intended to transport it to the east and sell it there. He intended to procure from the bank the financial accommodation necessary to enable him to transport and sell, and to give the bank what any pledgee requires, namely, the means of controlling the grain until its advance was satisfied; and the bank never desired anything more. The western dealer, the pledgor, remained the general owner. He was at all times, prior to the passage of the title to the ultimate vendee by the full payment of the purchase price and charges, responsible to the bank for any advances which the ultimate vendee and the grain failed to satisfy; while if there had been a regular sale the bank must have looked to the grain alone. He could at any time take the grain out of the bank's control, without regard to its wishes, by the payment of its advances. He could hold the bank responsible in damages, in case it interfered with the progress of the grain to its destination for any other purpose than to protect its lien. The bank had absolutely no rights

which do not belong to a pledgee, and the western dealer had all of the rights belonging to a general owner whose grain is in pledge.

Two only of the other objections to the doctrine of *Moors v. Kidder* will be mentioned. The first is that the court uses the term "commercial correspondent" so as to make it cover and include both parties to the transaction, to wit, the western buyer of the grain, or the pledgor, and the bank advancing the money, or the pledgee. When the court merges the parties it naturally merges their interests likewise. The trouble arises from thinking that the ultimate vendee in the Logan case, who simply orders the goods and acquires no interest whatever until he has fulfilled the terms of the contract of sale, stands in the same relation to the bank as the party who signs the trust receipt. The real fact is, that the signer of the trust receipt is the general owner, who becomes the pledgor through the act of his authorized agent, and thus stands in the same relation to the bank and the goods as the western pledgor and general owner in the Logan case, who has the title to the goods and retains it, subject to the lien of the bank, until the transaction is closed. The second and still more fatal objection arises from the disappearance of the bill of lading, which becomes *functus officio* and exercises no further influence upon the rights of the respective parties to the goods, since it is succeeded, and to some extent replaced, by the trust receipt.

It is clear that the New York courts never intended to disregard the possession and control of chattels as facts likely to influence the action of third parties in dealing with the goods. They repeatedly refer to the bill of lading as a muniment of title, and as a proper evidence of the condition of that title, so long as the carrier has anything to do with the goods. Thus, in the Logan case, the court says, on page 583:—"Third persons dealing with the property thus shipped, though acting in good faith, in the regular course of business, and paying value, are affected by the terms of the bill of lading and bound to look into it, and are chargeable with a constructive notice of the contents of

it." This principle justifies itself so long as the bill of lading is active, but by no stretch of authority can the same doctrine be maintained as to the trust receipt. No third party can be charged with constructive knowledge of its contents, and if the signer of the trust receipt is allowed to deal with the property so as to violate the rules of law and public policy, the holder of the trust receipt will not be permitted to maintain his claims in a case where the rights of general creditors are at stake.

So long as a party has an absolute and unrestricted title to personal property, he may deal with it as he will, provided he violates no rule of law or public policy, but so soon as the title begins to be qualified or restricted in any way, so soon does the law begin to limit the freedom with which he may safely use it. Both the common law and the statutes distinguish and widely separate the position and rights of the party who *gives* a title, from the position and rights of the party who *receives* a title, whether that title be absolute or qualified. In cases involving the rights of a third party the courts generally maintain the rights of the person who had the title to *give*, against the third party; while as between the third party and the person who has *received* or desires to receive the title, the rights of the third party are generally upheld. The person who had the title originally may transfer the possession without misleading the public. But if one who has recently acquired a complete title to or any interest in the property, becomes divested of possession, third persons are very easily misled. That the Wire Co. in the cases at bar was the party from whom the bankers acquired whatever title or interest they had in the property, is conclusively shown by the wording of the contracts, which they drew themselves. The Wire Co. was then the party having the title to give.

Let us suppose, first, that the applicants' claim is that the Wire Co.'s contracts with themselves should be construed as sales, absolute or conditional, from it to the bankers. The facts show that the property was placed back in the hands of the vendor, or original owner, as soon as it could be de-

livered by the carrier, and remained under the control of the Wire Co., which had an express power of sale, and which used the property in the same way that other manufacturing companies use their raw material. All this took place without any notice of any kind to the public or to purchasers that the Wire Co.'s title to the property was qualified in any way. As to transactions of this nature, this court has made the law of Connecticut perfectly clear in the following, among numerous other familiar decisions:— *Swift* v. *Thompson*, 9 Conn., 63 ; *Carter* v. *Watkins*, 14 id., 240 ; *Crouch* v. *Carrier*, 16 id., 505 ; *Shipman* v. *Ætna Ins. Co.*, 29 id., 245 ; *Norton* v. *Doolittle*, 32 id., 405 ; *Hull* v. *Sigsworth*, 48 id., 258. In *Shipman* v. *Ætna Ins. Co.* the court say, (p. 253) :—" In order to protect a sale of tangible personal property, capable of immediate delivery, against the creditors of the seller, the purchaser must take and retain possession of the goods. If he does not, his purchase may be treated as fraudulent and void. The vendor's retention of possession is a badge of fraud which vitiates the sale." In *Norton* v. *Doolittle*, in comparing that case with *Crouch* v. *Carrier*, the court say, (p. 409):—" They are analogous in respect to the vice in the transactions which rendered them void in the law, in that there was to the view of the world no apparent change of ownership, no actual, visible and continued change of possession, to indicate the change of title and bailment that had taken place."

The difference between the position of a general owner, like the Wire Co., in *giving* a title, and that of a person *receiving* a title, whether absolute or qualified, is clearly pointed out in the leading case of *Forbes* v. *Marsh*, 15 Conn., 384. The court say, (p. 397) :—" The rule of law making the property of one man liable for the debts of others in whose hands it is found, is applicable particularly to that property which was once owned by the possessor, and is by him sold or mortgaged to another, and then suffered to remain in his possession. In such cases possession is evidence of fraud, because there is not given to the world the usual evidence of a change of title. The vendor or mortgagor is, there-

fore, presumed to remain the owner of the property as here-
tofore. It is otherwise in cases like that before us. The
vendee comes into possession of property which was known
to belong to another man. Whether, therefore, the vendee
had borrowed it or hired or purchased it, becomes a matter
of inquiry, and ought to be ascertained by him who pro-
poses to trust his property upon the faith of this appear-
ance ; for the law offers its protecting shield to those who
attempt to protect themselves." The case of *Lewis* v. *Mc-
Cabe*, 49 Conn., 141, contains a thorough examination of the
law of conditional sales and goes, perhaps, as far as any of
our cases in protecting the general owner, and clearly recog-
nizes the difference between the rights of the vendor and
the vendee when questions are raised by third parties. This
opinion contains one passage, (p. 155,) which is in itself a
complete answer to the applicants' claims, and is as follows:
" If, however, the contract in question must be construed to
mean that the plaintiff authorized McAvoy to sell the pro-
perty as his own, we should be constrained to hold it so ab-
solutely inconsistent with the retention of the title in the
plaintiff as to waive or make void the condition." That is,
to make it void even against the general owner ; much more
then must it be void as against the vendee or pledgee.

If the applicants should claim that their lien as pledgees
should be sustained, we fall back upon the elementary prin-
ciple that the pledgee's rights as against third parties ter-
minate with his possession, as the applicants have never had
even a constructive possession since they parted with the
bills of lading upon the arrival of the goods at the port of
New York. In *Casey* v. *Cavaroc*, 96 U. S. R., 467, the court
say in speaking of a pledge : " Other formalities might have
been dispensed with; but possession was essential ; made so
by the express terms of the law."

It is clear, therefore, that it makes no difference whether
the applicants claim that they acquired an interest in the pro-
perty from the general owner by sale, mortgage or pledge, or
whether they apply some other name to a contract which in
its substance must have been one of these three. In any

event they allowed the general owner to continue in the apparent and unexplained possession which, as our courts have uniformly and forcibly declared, makes such contracts void as against creditors. Nor can the proposition be maintained before this court, in the face of the facts in the records, that the Wire Co. was only an agent of the applicants to manufacture and sell the rods. The claim of agency is clearly at variance with the terms of the printed contracts and with the leading facts of record in the cases at bar, and can only be made in an attempt to escape from the requirements of the law by changing the words applied to facts whose real nature cannot be altered. To sustain such a claim, moreover, would be to furnish every vendee, mortgagee and pledgee with a ready excuse for allowing property to remain in the open and unexplained possession of the original owner, with manifest injustice to the public.

The real parties to these cases are the applicants on the one hand, who claim certain preferences under their trust receipts, and the body of the general creditors on the other, who act through the receiver as their representative. It is the receiver's duty to see that no preferred claims are allowed against the company, which could be successfully resisted at law by the general creditors. *Casey* v. *Cavaroc*, *supra*. While there are no Connecticut cases which fully define the duties of a receiver on this point, there are numerous decisions which state the duties of an assignee or trustee in insolvency. And it must be conceded that the rights of the general creditors under our law to the assets of an insolvent estate remain the same, whether the officer of the law, chosen to administer the estate for the creditors' benefit be called a receiver or a trustee. Among these cases are *Swift* v. *Thompson*, 9 Conn., 63 ; *Rood* v. *Welch*, 28 id., 157 ; *Shipman* v. *Ætna Ins. Co.*, 29 id., 245 ; *Gaylor* v. *Harding*, 37 id., 508. In *Shaw* v. *Smith*, 48 Conn., 306, the court say, " The assignee represents the creditors, and could make void such sale as effectually as creditors could have done had they attached the property." And then, referring to the earlier

decisions, adds, " This doctrine has been repeatedly declared in this state, and is too well established for controversy."

We claim next that the cases at bar are governed by the law of Connecticut as the place of the situs of the property and the making of the contracts. The record shows that the contracts and trust receipts were sent to New Haven by the applicants and signed in New Haven by the Wire Co.; and that the statements of account were rendered by the applicants to the Wire Co. in New Haven, and that the balances were adjusted by checks there dated and signed and drawn on a New Haven bank. *Vanbuskirk* v. *Hartford Fire Ins. Co.*, 14 Conn., 586; *Green* v. *Vanbuskirk*, 7 Wall., 139.

The propositions which we claim to have established are :—(1.) That the real issue in these cases is between the general creditors and the creditors claiming preferences. (2.) That this issue must be determined by the law of Connecticut. (3.) That the Wire Co. was, up to the time of the receiver's appointment, the general owner of the property claimed, and that the applicants never had more than a pledgee's interest in it. (4.) That by allowing the Wire Co. to retain the open and unexplained possession, and by allowing it to manufacture and sell the property as its own, the applicants put themselves in a position where they cannot assert such title as they may once have had against the general creditors.

BEARDSLEY, J. This is an application to the Superior Court for the county of New Haven for an order compelling the receiver of an insolvent corporation to deliver specified articles of personal property to the applicants, of which they claim to be the owners, but which he holds as the property of the corporation.

On or about September 7th, 1887, Samuel A. Galpin of New Haven was duly appointed the temporary receiver of the New Haven Wire Company, a corporation located at New Haven. He was subsequently made and still is receiver, and as such duly holds possession of the property and effects of the corporation, and is proceeding to wind up its affairs

and dispose of its property and effects pursuant to law. As such receiver there came into his possession certain machines for the manufacture of nails, and about 2635 tons of wire rods. He claims this property as that of the corporation.

Concerning a portion of this property Baring Brothers, of London, England, make the following application:—

"The application of Baring Brothers, and of Kidder, Peabody & Co., respectfully represents that said firm of Baring Brothers is a firm engaged in the business of banking at London, in the kingdom of Great Britain, and that Kidder, Peabody & Co. are the American agents and correspondents of said Baring Brothers, doing business in the city of New York; that the New Haven Wire Company is a corporation organized under the laws of the state of Connecticut, and located in New Haven in said state; that one Samuel A. Galpin has been appointed temporary receiver of the assets, effects and estate of said corporation, and has duly qualified as such, and is now in possession of the property and effects of said corporation, and is proceeding to wind up its affairs and to dispose of its property and effects, pursuant to the statute in such case provided; that among the property and effects which have come into the custody of said Galpin as receiver, are certain bundles of wire rods, in all about one thousand tons thereof, and certain other property and effects, which are the proper goods and estate of your applicants, and to the immediate possession whereof your applicants are entitled, and which your applicants are desirous of having delivered out of the custody of said receiver and into the possession of your applicants. Your applicants therefore pray your honor to order and decree that upon proof of ownership, and of the right to the possession of said wire rods and other property, said receiver be authorized and empowered to deliver the same to your applicants."

Concerning another portion, Brown Brothers & Co. of New York, and Brown, Shipley & Co. of Liverpool and London, England, make the following application:—

"Your applicants are the absolute owners and entitled to the immediate possession of certain personal property, now

situated in the yard owned and occupied by said corporation, to wit, twenty thousand bundles of iron and steel rods and wire, and seven boxes of nail machines; and are also the owners and entitled to the immediate possession of certain other personal property, to wit, fifty thousand bundles of iron and steel rods and wire, in which said corporation or said receiver may claim some equitable interest. Said receiver claims to have the custody of all of said property and desires to have the order of this court before surrendering the same to your applicants. A large amount of the property of your applicants had been sold by said corporation prior to the appointment of the receiver and not paid for, and the debts and choses in action accruing therefor, a more particular description of which your applicants are at present unable to give, are now held by said corporation or said receiver, and your applicants are entitled to have the same turned over and assigned to them. Said corporation, or said receiver thereof, now holds a large amount of cash on hand, proceeds of the sale of property of your applicants, which proceeds of such sales your applicants are legally entitled to receive. Your applicants therefore pray that inquiry be made into the truth of the allegations of this application, and on finding them to be true, that an order be made that said receiver deliver and turn over to your applicants all personal property in his custody or in the custody of said corporation belonging to your applicants or which they are entitled to hold, and assign and transfer to your applicants all choses in action and the evidences thereof to which they are entitled, and pay over to them all cash on hand which they shall be found entitled to receive; or that the court in some other way would grant relief to your applicants."

Concerning another portion, Heidelbach, Ickelheimer & Co. of New York, make the following application:—

"The application of Heidelbach, Ickelheimer & Co., bankers of the city and state of New York, respectfully represents that they are the owners of certain iron and steel rods of various sizes, and certain other property and effects,

now in the custody and keeping of the customs authorities of the United States of America, and stored upon premises in said town of New Haven near the mills of the New Haven Wire Company; that other iron and steel rods, owned by other and different parties, are stored upon the same premises, which premises are attached to the mills of the said New Haven Wire Company, of which Samuel A. Galpin of said New Haven is the receiver; and that it is important to the interests of your applicants, and of said receiver, and of all the other owners of iron and steel rods as aforesaid, that the specific property owned by each be designated in some proper manner, and the same removed or otherwise disposed of. Wherefore your applicants pray that the foregoing matters be inquired into, and upon the same being found to be true, that an order may be made directing said receiver to deliver to them the above described property, they paying the custom duties thereon, and that such other order may be made as to equity and justice may appertain."

These applications were referred to a committee to find and report the facts pertaining to each; and upon the coming in of the report the question as to what order should be made in the premises, was reserved for the advice of this court. Most of the facts found being common to the three applications, they were heard in connection.

It is a sufficiently full recital of the facts in the case of Baring Brothers & Co. to say that the New Haven Wire Company is a corporation in this state. E. S. Wheeler was the owner of a majority of its shares, and its manager. He individually carried on business at New Haven and New York under the name of E. S. Wheeler & Co. Also he and one Humphrey were commission merchants in Liverpool, England, under the name of E. S. Wheeler & Co. Kidder, Peabody & Co. were bankers in New York and Boston, representing in the United States Baring Brothers & Co., bankers in Liverpool and London.

At its mill in New Haven the New Haven Wire Co. manufactured wire, chiefly from rods purchased in Germany, to be paid for upon delivery. Being unwilling to furnish the

capital and subject itself to the expense necessarily attend-
ant upon placing money in Germany for the purchase of the
rods, it availed itself of the credit of Baring Brothers & Co.
through Kidder, Peabody & Co.; E. S. Wheeler & Co. of
Liverpool acting as its agent in the purchase of rods from
the manufacturers.

Baring Brothers & Co. agreed to accept drafts drawn by
E. S. Wheeler & Co. of Liverpool against rods, upon terms.
Their acceptance would command money at low rates in all
commercial centers. They were willing to furnish the credit
for the lowest price, if they could have the highest degree
of security. To this end they demanded and received a con-
tract from the New Haven Wire Co. in consideration of
their advancements, the pertinent part of which is as fol-
lows :—

"NEW YORK, February 16th, 1887.

" Received from Messrs. Kidder, Peabody & Co., the orig-
inal of the within letter of credit for ten thousand pounds
sterling, say £10,000, stg. In consideration whereof we
hereby agree with Baring Brothers & Co., and Kidder, Pea-
body & Co., respectively, to provide and furnish to Kidder,
Peabody & Co., or Baring Brothers & Co., sufficient funds
to meet the payment (in London), at or before maturity, of
whatever bills may be drawn or negotiated by virtue of such
credit, together with the commission upon the amount of
such bills, which it is agreed shall be one-half of one per
cent on drafts at sixty days' sight or two months' sight, three-
quarters of one per cent on drafts at ninety days' sight ; one
per cent on drafts at four months' sight ; and one and one-
half per cent on drafts at six months' sight. And we also
agree to give to and deposit with Kidder, Peabody & Co.
sufficient and satisfactory security here, at any time prior to
the maturity of said bills, for the full payment thereof, if
notified by Baring Brothers & Co. or by Kidder, Peabody
& Co. to do so ; and, in addition to such obligation to give
said security, all property as for cost of which bills shall be
drawn under the within credit, and the proceeds thereof and
the policies of insurance thereon, (which insurance to the

amount of the value of such property we agree shall be duly effected and which insurance we agree shall be satisfactory to Baring Brothers & Co. and to Kidder, Peabody & Co.,) together with the bills of lading for the same, are hereby, in consideration of this credit, sold, assigned and transferred to Baring Brothers & Co. and to Kidder, Peabody & Co., (subject only to our right to acquire title to the same by the complete and strict performance of this contract,) as collateral security for the payment as above promised, and also of any other sums which may at the time of such purchase, or at any time before the making of the payment above promised, be owing by us to Baring Brothers & Co. or to Kidder, Peabody & Co. It being understood and agreed that, as between us and Baring Brothers & Co. and Kidder, Peabody & Co., the parties authorized to draw bills under said credit are in all respects to be regarded as our agents, and that neither Baring Brothers & Co. nor Kidder, Peabody & Co. are to be under any responsibility to us in respect to the bills of lading or other documents which they have the right to require to accompany the bills drawn, nor shall any error in, or nonconformity to, or deficiency of, bills of lading or other documents, be any defence against our obligation for reimbursement in respect of bills actually drawn by the party designated for drawing bills under said credit, the provision for such bills of lading and other documents being intended merely for the purpose of affording additional security to Baring Brothers & Co. and Kidder, Peabody & Co."

When, upon the order of E. S. Wheeler & Co. of Liverpool, the German manufacturer had completed and was ready to deliver a particular lot of rods, they caused it to be shipped, taking the consular invoice and the bill of lading in the name of Baring Brothers & Co., and delivered these documents to them, together with a draft on them for the value of the rods mentioned in the bill of lading as set forth in the invoice. The draft specified the particular letter of credit under which it was drawn. Upon the receipt of the invoice and bill of lading they accepted the draft. E. S. Wheeler & Co. of Liverpool at once sold it and paid the manufacturer

from the proceeds. Baring Brothers & Co. notified Kidder, Peabody & Co. of these transactions and forwarded the invoice and bill of lading to them. The latter delivered the rods to E. S. Wheeler & Co. of New Haven, as agents for the New Haven Wire Co., upon condition of the execution and delivery by the latter to Kidder, Peabody & Co. of the following or a like receipt.

"NEW YORK, May 26th, 1887.

"MESSRS. KIDDER, PEABODY & CO., New York: *Gentlemen,*—We acknowledge receipt from you, as attorneys for Messrs. Baring Brothers & Co., of invoice and bill of lading of Galpin, sixteen hundred and forty bundles iron rods, wg. 40,640 kos, (Liverpool £401. 8. 10), and eleven hundred four bundles. Received the above.

"C. E. HERRING, May 26th, 1887.

"Shipped by E. S. Wheeler & Co., on board steamship Rhynland, at Antwerp, and consigned to the order of Messrs. Baring Brothers & Co., and endorsed by you, as their attorneys, to us; and we hereby agree to hold the said goods in trust for them and as their property and subject to their order, with liberty however to sell the same, provided that in case of sale we·account for and forthwith pay and deliver the proceeds or avails of said sale to Messrs. Baring Brothers & Co. and Messrs. Kidder, Peabody & Co., which we hereby agree to do; such proceeds belonging to Messrs. Baring Brothers & Co. and Messrs. Kidder, Peabody & Co., and not to us, the said goods being goods held for them as security under the agreement contained in the receipt signed by us for your letter of credit on them, No. 844; we agreeing, at our expense, to keep them covered by insurance against fire, for account of and loss payable to Messrs. Baring Brothers & Co., under and in pursuance of the terms of said agreement.

"THE NEW HAVEN WIRE CO.

"B. E. BROWN, *Treasurer.*"

The decisions are so numerous, and by so many courts, to the effect that when a commercial correspondent advances

money for the purchase of property and takes possession, either actual or symbolical, he becomes the owner thereof, even when the advancement was made and the property was purchased at the request and for the ultimate use and profit of another, and there is an agreement to transfer title to that other upon the performance of conditions precedent, and ownership was taken solely for the protection of the advancement, that such may be said to be the established rule.

In *Dows* v. *National Exchange Bank*, 91 U. S. R., 618, the marginal note is to this effect:—" A party discounting a draft and receiving therewith, deliverable to his own order, a bill of lading of the goods against which the draft is drawn, acquires a special property in them, and has a complete right to hold them as security for the acceptance and payment of the draft. Where such party forwarded the draft with the bill of lading thereto attached, to an agent with special instructions by special indorsement on the bill and by letter to hold the wheat in the bill mentioned, against which the draft had been drawn, until payment of the draft should be made, the agent had no power, prior to such payment, to make a delivery which would divest the ownership of his principal." And in the opinion it is said of a bank which had discounted drafts drawn against the property, and to which bills of lading were delivered with the drafts as security, that it became the owner of the property, and had a complete right to maintain ownership until payment.

In *Moors* v. *Kidder*, 106 N. York, 32, it is said as follows: " When a commercial correspondent, however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes a bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase price, he becomes the owner of the property instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid. * * * The bill of lading is the evi-

dence of title and is sufficient to vest the ownership and absolute control in him to whose order it is drawn."

Concerning a contract of a character similar to the one under consideration the court remarks as follows:—" Swain, on his part, agreed to provide funds in London to meet such bills as should be drawn at their maturity, and that ' all property which shall be purchased by means of the within credit, together with the bills of lading for the same, are hereby pledged and hypothecated to Messrs. Baring Brothers & Co. as collateral security for the payment as above promised, and shall be held subject to their order on demand, with authority to take possession and dispose of the same at discretion, for their security and reimbursement.'   The argument upon this provision rests upon the words 'pledged' and 'hypothecated ' and 'collateral security,' and avers as a consequence that Swain was, within the contemplation of the parties, general owner of the shellac, and the Barings merely pledgees. * * * It has already been mentioned that a similar expression was used by the plantiff in the Logan case, in the matter stamped upon the bill of lading describing the wheat as ' pledged ' to the plaintiff and as ' security' for the payment of the draft, and so little did the use of the inapt words affect the plain and unequivocal substance of the transaction in the mind of the court, that the use of the word ' pledged ' was not even made the subject of remark. * * * It is also to be noted that what is spoken of as ' pledged' is not merely the goods or the property, but the bills of lading also. These documents carry the title as well as the right of possession, and the pledge or hypothecation is expressly applied to both.   The meaning assuredly was that the title should pass."

In *Commercial Bank of Keokuk* v. *Pfeifer*, 108 N. York, 242, the marginal note is, that the " discount of a draft drawn by a consignor upon his consignee, accompanied by a bill of lading to the party making the advance, passes to him not only the legal title, but in the eye of the law is regarded as an actual delivery and change of possession of the property."

In *Farmers & Mechanics Bank* v. *Logan*, 74 N. York, 568,

the marginal note is to this effect :—" When commercial correspondents, on the order of a principal, make a purchase of property ultimately for him, but on their own credit or with their own funds, and such course is contemplated when the order is given, they may retain title in themselves until they are reimbursed. This may be done by taking the bill of sale in their own name, and, when the property is shipped, taking from the carrier a bill of lading in such terms as to show that they retain the power of control and disposition of it. The bill of lading confers upon the person in whose favor it is issued, or to whom it is transferred, the title to the goods, and this, although the transaction is not intended to give the permanent ownership, but to furnish security for advances of money or discount of commercial paper made upon the faith of it. Third persons dealing with the property thus shipped, though acting in good faith, in the regular course of business, and paying value, are affected by and chargeable with constructive notice of the contents of the bill of lading."

In *Barry* v. *Boninger*, 46 Maryland, 59, the marginal note is to this effect :—" A cargo of sugar was imported by *S. A. & Co.* under letters of credit from the plaintiffs, and arrived in Baltimore under bills of lading in their name, in accordance with the agreement between them and *S. A. & Co.* contained in the letter of credit. Upon the arrival of the vessel *S. A. & Co.* gave them a receipt for the sugar specified in the bill of lading, in which it was stated that they agreed to hold it on storage as the property of the plaintiffs, with liberty to sell the same and account to them for the proceeds, until the drafts drawn by *S. & B.* on London, in pursuance of the letter of credit, and accepted by them against the cargo of sugar, should be provided for. The cargo was sold to *M. N. & Co.* of Philadelphia through the defendants as brokers, but before it was all delivered *S. A. & Co.* failed. The defendants were then authorized to deliver the balance of the cargo and draw for the proceeds. Upon the receipt of the money from the purchasers the defendants retained out of it the amount due them from *S. A. & Co.* for broker-

age in selling other cargoes imported by them and not be-
longing to the plaintiffs. Held that the property in the
sugar was in the plaintiffs under the letter of credit and
*S. A. & Co.'s* trust receipt; that the property of the sugar
so being in the plaintiffs, the defendants had no lien upon
it for, and could not retain out of it, the amount due from
*S. A. & Co.* for brokerage effected by them."

In *Forbes* v. *Boston & Lowell R. R. Co.*, 133 Mass., 154,
the marginal note is as follows:—" The transfer and deliv-
ery of an inland bill of lading of goods, by the consignee,
to a person who advances money upon them, is not in form
or effect a mortgage, but vests in such person a property in
the goods which entitles him to maintain an action against
one who wrongfully converts them."

In *Moors* v. *Wyman*, 146 Mass., 60, the plaintiff issued to
a Boston firm letters of credit to bankers in London, under
which the firm bought hides, taking bills of lading to the
plaintiff's order by agreement, the plaintiff to have a lien
on the hides, bill of lading, and policy of insurance, with
authority to take possession and dispose of them at discre-
tion, for his security or reimbursement. He indorsed the
bills of lading to the Boston firm, they signing an agree-
ment that they received the hides as his agent, to be con-
verted into leather for him, and were to deliver to him the
identical leather into which the hides should be converted.
The intention of the agreement was stated to be to protect
and preserve unimpaired his lien. It was held that the
plaintiff had a title, whether absolute or qualified did not
matter; and that his indorsement of the bills of lading to
the Boston firm did not release that title.

Undoubtedly, upon decisions by the English courts, when
E. S. Wheeler & Co. of Liverpool, acting for the New Haven
Wire Co., delivered to Baring Brothers & Co. consular in-
voices and bills of lading of rods on shipboard in the name
or to the order of the latter, in exchange for the acceptances
which paid for the rods, in pursuance of the agreement which
procured the letter of credit and for the purposes therein
expressed, the ownership was in them. *Wait* v. *Baker*, 2

Exch., 1; *Shepherd* v. *Harrison*, L. R., 5 H. L., 116 ; *Turner* v. *Trustees of Liverpool Docks*, 6 Exch., 543 ; *Mirabita* v. *Imperial Ottoman Bank*, L. R., 3 Exch. Div., 172 ; *Barber* v. *Meyerstein*, L. R., 4 H. L., 334.

In the present case, by their acceptance of the draft of E. S. Wheeler & Co. of Liverpool, Baring Brothers in effect purchased and paid for the rods from their own money. By this act, and by the taking of the consular invoices and bills of lading for the same in their own name, in pursuance of the agreement, they became absolute owners thereof ; absolute for all purposes of this application, notwithstanding the fact that they were under obligation to sell them to the New Haven Wire Co. upon the performance by the latter of its agreement. They could have sold the rods to a third person and have given him perfect title, leaving the Wire Co. to its action for damages for a breach of contract to deliver to it. The possession of the bills of lading to their own order and of the consular invoices, in addition to and because of the fact that they had advanced the money for the purchase of the rods therein described, made them owners, with all attending rights. They had actual and exclusive possession, by symbol.

It was the sole purpose of the New Haven Wire Co. to cause rods to be laid down at its mill in New Haven, at the least possible outlay, with the right to redeem them and convert them into wire. This it accomplished by its arrangement with Baring Brothers. This accomplished, the conditions imposed were matters of no consequence to it. It was the sole purpose of Baring Brothers to obtain their commission and the highest security for their advancement. Therefore they became owners of the rods, under an agreement to sell and deliver upon performance of a precedent condition, because ownership gave the greatest possible certainty that they would suffer no loss. They relied upon that for repayment, refusing to rest upon the Wire Co. or upon E. S. Wheeler & Co. They did not desire to deal in rods as merchants, nor to manufacture them into wire, but the law permits ownership for security equally with owner-

ship for profit. Although the New Haven Wire Co. first moved in this series of transactions, and the end desired was profit to itself from the ownership and sale or use of iron rods, its intent to supplement and confirm by express contract the title which the law confers upon the commercial correspondent is quite plain. To prevent any inference of present ownership in itself from the fact that ultimate ownership and profit or loss were to be upon it, it proceeds to "sell, assign and transfer" to the correspondent all property thereafter to be paid for by them upon its request. The meaning of which words applied to rods thereafter to be purchased, perhaps manufactured, is that it will not make, nor allow any person to make in its name, any claim, legal or equitable, to ownership thereof, until repayment of the purchase money to the correspondents. The contract binds these last to pay for the rods, and upon the performance of conditions precedent to transfer title; and it binds the New Haven Wire Co. to perform the conditions and take the title; and the phrases "collateral security," and "additional security," while they recognize and preserve to it this right to title upon performance, put no limitations upon ownership by the correspondents. A contract of purchase and sale is within legal protection, although the vendee takes title merely for protection, and agrees to re-sell upon the performance of conditions, if the transaction assumes that form in good faith. The intent of the parties stands clear in the light of the trust receipt. The Wire Co. was able to obtain possession of the rods only upon its written agreement to hold them in trust for the applicants, and as their property and subject to their order, with liberty to sell as the property of the applicants, and that in case of sale it would account for and forthwith deliver the proceeds to them, declaring that these belonged to them and not to itself, and that it held the rods for them as security under the agreement contained in its receipt for the letters of credit. The ownership by the applicants, which is hereby so distinctly acknowledged, can be only that which resulted

from their acts of payment, and of taking the bill of lading in their own name, in pursuance of that agreement.

The result is not varied by the fact that the German manufacturers permitted E. S. Wheeler & Co. of Liverpool to have possession of bills of lading of rods on shipboard at Antwerp, either in their own name or that of the applicants. In all cases the former immediately indorsed and delivered them to the latter in exchange for their acceptances, sold these, and with the proceeds redeemed their obligation to pay the manufacturers cash upon delivery. In effect through them the manufacturers delivered the rods to the applicants for money paid by these last; and they having, at the request of the New Haven Wire Co., paid the money and taken the bills of lading and consular invoices in their own names, became owners as perfectly as if they had dealt with the manufacturers without the intervention of E. S. Wheeler & Co. of Liverpool. Whatever of title, in form, was in these last, was theirs, upon the understanding of all the parties, for the sole purpose of passing it to the applicants, for the reason that they had paid for the rods. As E. S. Wheeler & Co. of Liverpool ordered rods at the request and for the ultimate benefit of the New Haven Wire Co., and as neither they nor their principal furnished either money or credit, the act of E. S. Wheeler & Co. of Liverpool was in legal effect simply a requirement of Baring Brothers & Co. to perform their obligation to buy and pay for specified lots of rods.

The applicants, being owners of iron rods, could make a conditional sale thereof accompanied by delivery of possession, to the New Haven Wire Co., and yet retain the ownership until the fulfillment of all conditions. This, upon the familiar principle that a man may condition as he will with his own provided he does not violate any rule of law. Or, as the rule is stated in Benjamin on Sales (2d Am. ed., § 320)—" When the buyer is by the contract bound to do anything as a condition, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the

goods may have been actually delivered into the possession of the buyer." In *Harkness* v. *Russell*, 118 U. S. R., 663, it is declared that the rule "is established by overwhelming authority; namely, that, in the absence of fraud, an agreement for a conditional sale is good and valid, as well against third persons as against the parties to the transaction." See also *Ballard* v. *Burgett*, 40 N. York, 319; *Bean* v. *Edge*, 84 N. York, 510; *Forbes* v. *Marsh*, 15 Conn., 394; *Lewis* v. *McCabe*, 49 Conn., 141; *Burbank* v. *Crooker*, 7 Gray, 158. And this, notwithstanding the fact that the delivery is accompanied by permission to sell, provided the Wire Co. shall sell as the property of the applicants and hold the proceeds in trust for them.

The conditions may be not only that the vendee shall pay the value of the property sold, but also that he shall pay all other indebtedness to the vendor. To the validity of the transaction it is only requisite that it shall be one of good faith, and not a cover for a pledge.

A rule of law requires the vendee of personal property of which the vendor has had visible possession and use, to make such change of possession and use as will thereafter prevent the public from giving credit to the vendor upon the strength of an apparent continued ownership of that which has become the property of another, if he will protect himself in his purchase. But that rule does not render a conditional sale impossible. The conditional vendor continues in himself the ownership. In effect he has deposited his property in the hands of a bailee. And the law does not, as an universal rule, protect a man in the assumption that he who asks for credit is the owner of every article of personal property of which he has possession; it imposes upon the intending creditor the obligation to inquire into the character of that possession; and inasmuch as the inquiry is a necessity, it does not concern the public that the conditions are many; the answer will reveal all.

The applicants severally, as owners, delivered possession of rods to the New Haven Wire Co., with permission to sell and hold the proceeds as their own for them, and under an

New Haven Wire Co. Cases.

agreement to convey title to it upon the performance of certain conditions precedent. Reception upon these terms required it to hold the rods of each applicant so delivered apart from all other rods, preserving power of identification. But in fact it mingled the rods of the several applicants in confusion and identity was lost. After surrender upon the trust receipt the applicants made no inquiry concerning the rods. They had not asked the Wire Co. for any account either of sales or of manufacture thereof up to the time of the failure of E. S. Wheeler & Co. They did not know of the mingling of their rods with those of other owners, nor that the Wire Co. had manufactured their rods into wire before they were reimbursed for the acceptances which paid for them, except that Kidder, Peabody & Co. had knowledge of the sale of one lot of rods by the Wire Co. in New York before payment of the acceptance by which it was procured, and the proceeds were deposited with them for the purpose of keeping open the line of discount and were not applied in payment of the draft drawn against the rods sold. With this exception it was not proved that the applicants knew that the Wire Co. sold rods before paying the draft drawn against them. They believed that the Wire Co. and E. S. Wheeler & Co. would faithfully perform their obligations under the trust receipts.

As a matter of law it was the privilege of the applicants to believe, and to rely upon the belief, that both the Wire Co. and E. S. Wheeler & Co. would faithfully keep their promises. They were under no legal necessity to have knowledge of violations. The Wire Co. not having communicated information of violations could not have based a claim of waiver thereon. No more can its creditors.

Waiver is the intentional relinquishment of a right upon knowledge; it is to be proven as a fact. There is no finding of waiver; it is not for this court to find it.

The right of a creditor to sequester a portion of the debtor's property by attachment, and thereby gain priority over other creditors, is suspended by the appointment of a receiver. That officer, as the agent of the law, takes from

the debtor's possession all his property for division among
all creditors in equal proportions. The rights of all credi-
tors are in him as their representative. It is quite unim-
portant whether the law effects this purpose by the agency
of a trustee appointed by the Court of Probate or by a
receiver appointed by a court of law. Equally in either
mode, whatever right any creditor could have enforced for
his sole advantage, the law will enforce for him and all
others in equal proportions.

The principle underlying the claims of the applicants
results from decisions by the Supreme Court of the United
States, by courts of last resort in New York, Massachusetts
and other states, and by courts in England, and may well
find recognition here. Therefore we have not considered it
necessary to discuss the question as to whether the contracts
under review are to be regarded as having been made in
New York or in Connecticut, the result being the same.

In accordance with their agreement the applicants Baring
Brothers & Co. or Kidder, Peabody & Co. made conditional
sales and deliveries of rods to the Wire Co. upon conditions
as follows: The Wire Co. agreed to hold the rods in trust
for them and as their property and subject to their order,
with liberty however to sell, provided that in case of sale it
should account for and forthwith pay and deliver the pro-
ceeds or avails of the sales to them, which it agreed to do ;
such proceeds belonging to them and not to it; the rods
being held by it for them as security under the agreement con-
tained in a receipt signed by it for a letter of credit issued
by them to it. In consideration of the letter of credit the
Wire Co. agreed to furnish money to them for the payment
of all bills drawn under the letter ; also it sold, assigned and
transferred to them all property for cost of which bills should
be drawn under the letter, as collateral security for the pay-
ment as above promised; also for any other sums which
might at the time of such purchase or at any time before the
making of the payment above promised, be owing by the
Wire Co. to them. The effect of the trust receipt and of
the agreement thus recited is, that each lot of rods delivered

by Baring Brothers & Co. or Kidder, Peabody & Co. to the Wire Co. remained their property until the latter should repay the acceptance importing those rods : also all indebtedness due at the time of payment of the importing acceptance.

The applicants, Brown Brothers & Co., made conditional sales and deliveries of nail machines and of rods to the New Haven Wire Co. upon conditions as follows : The Wire Co. agreed to hold the nail machines and rods in trust, with liberty to sell the same, and in case of sale to hand the avails as soon as received to Brown Brothers & Co. as security for due provision for the acceptance of Brown, Shipley & Co. of Liverpool on its account noted at foot; and it further pledged to them the machines and rods and the proceeds thereof as security for the payment of any other indebtedness of it to Brown, Shipley & Co. In consideration of the letter of credit issued by Brown Brothers & Co. to it, the Wire Co. agreed to pay the drafts drawn under the letter; it also gave to them a specific claim and lien on all goods and the proceeds thereof for which Brown, Shipley & Co. should come under any engagement in virtue of the letter; also pledged to them the goods and the proceeds thereof as security for any other indebtedness from it to them. The effect of the trust receipt and of the agreement thus recited is, that each nail machine and each lot of rods delivered by Brown Brothers & Co. to the Wire Co. remained their property until the latter should repay the acceptance importing its nail machines or the rods ; also all indebtedness due at the time of payment of the importing acceptance.

Heidelbach, Ickelheimer & Co. are bankers and commercial correspondents in New York. As such, at the request of the New Haven Wire Co., they opened a credit for it with C. J. Hambro & Son, bankers and commercial correspondents in London. It was the understanding of all parties that, as a result of the series of transactions undertaken, Heidelbach, Ickelheimer & Co. should purchase, pay for, and become the owners of rods, ultimately to be sold to the Wire Co. upon conditions precedent. It was understood that they would put their own money into the hands of E.

S. Wheeler & Co. of Liverpool, to enable the latter to ful-
fill their obligations to pay the manufacturers cash upon de-
livery; that they would place their money in Liverpool
through C. J. Hambro & Son, acting for them, and that the
latter would for them demand and receive bills of lading and
consular invoices to their order—symbolical possession of
rods thus paid for. In further pursuance of the understand-
ing, C. J. Hambro & Son passed this title, with possession, to
Heildelbach, Ickelheimer & Co., who repaid the advance-
ments. They then came into actual possession of rods for
which they had paid, holding them as the sure means of
regaining the cost.

They are therefore the commercial correspondents for
whose protection the rule exists. And this result is in
accord with the written contract executed by the Wire Co.
by which it agreed that all rods purchased under the letter
of credit were pledged and hypothecated to them for repay-
ment of such money as they should advance. Regardless of
the number of agents who might be employed, the burden
of paying their own money, and trusting solely to the rods
for repayment, fell at last where in the beginning it was
intended that it should fall. Hambro & Son were a link in
the chain connecting the applicants with the German manu-
facturers; there might have been others and yet the result
remain the same.

Heidelbach, Ickelheimer & Co. made conditional sales and
deliveries of rods to the Wire Co. upon conditions as follows:—
The Wire Co. agreed to hold the rods in trust for them and
as their property until the proceeds thereof should be actually
turned over to them; the rods being subject to their order
and their rights as owners thereof; the delivery to the Wire
Co. of the bill of lading not to operate as a waiver of their
ownership, nor of due performance of the agreement in the
receipt signed by the Wire Co. in consideration for their
letter of credit. The Wire Co. in consideration of the
letter of credit agreed to provide money for the payment of
all bills drawn thereunder; it also pledged to them all prop-
erty which should be purchased by means of the letter of

credit, as collateral security for the fulfillment of its agreement to pay; also, for the payment of any other sums which might at the time being be owing by it to them. The effect of the trust receipt and of the agreement thus recited is, that each lot of rods delivered by Heidelbach, Ickelheimer & Co. to the Wire Co. remained their property until the latter should repay the acceptance importing the rods; also all indebtedness due at the time of payment of the importing acceptance.

This rule to be applied also to all rods concerning which the condition upon which the Wire Co. received them from Heidelbach, Ickelheimer & Co. should still rest in parol, if the terms thereof were as those of the written conditions applied to other rods, as set forth in the record in the case of these applicants.

It was the understanding and intention of all parties to these agreements that whenever the absolute title to a particular lot of rods so delivered upon conditions should be necessary to the Wire Co. for the profitable conduct of its business, it should then be possible to it to obtain such title; to obtain it, if need be, contrary to the will of the applicants by a sufficient tender. And as it was the expectation of all parties that importation and conditional sales and deliveries would succeed each other to an indefinite point in the future; that for these an overlapping succession of acceptances would come into existence extending to a constantly receding date, it is not within the reasonable interpretation of the contract to say that it contemplated the burdening of each lot of rods with this accumulating indebtedness; nor to say that the applicants required from the Wire Co. the payment of acceptances before maturity as a condition precedent to obtaining title to rods which it had paid for. It is rather to be interpreted as permitting it to obtain such absolute title by paying for the rods, and by paying in addition such other indebtedness from it to them as should then be due; by paying a sum capable of such exact computation as to be the basis of a valid tender. Thus all rods purchased under all letters of credit, whether

the letter was exhausted by one or several acceptances, were sold upon condition of the payment of the purchase price, and no acceptance was without the security of that condition. The several expressions, "and also of any other sums which may at any time before the making of the payment above promised be owing by us," and "we further pledge to you said goods and the proceeds thereof as security for any other indebtedness of ours to you," and "for the payment of any other sums which may at the time being be owing by us to you," are all referable to the time when the Wire Co. should pay the cost of the particular lot of rods conditionally purchased.

The legal effect of the conditional sale and delivery of rods to the vendee with power to sell them as the property of the vendors and deliver the proceeds to them, is, that upon such sale the rods ceased to be security to the applicants, and inasmuch as the Wire Co. did not pay over to them the identical proceeds of any sale, but retained the proceeds of all sales, and mingled the money with and used it as its own, indistinguishably, it became their debtor, and they became its creditors, upon the same footing as all other creditors, without right of priority. After sale their security was only the fidelity of the Wire Co. to its agreement to hold the proceeds of their rods apart and pay them over.

Inasmuch as such sale and delivery of rods by the applicants to the Wire Co. were upon two conditions, namely, that the applicants should continue to be the owners thereof until the Wire Co. should furnish them with money to meet the acceptance given for the purchase of the rods, also until the Wire Co. should pay to the several applicants all indebtedness due and payable at the time of the payment of the importing acceptance; therefore, if the Wire Co. should furnish the applicants sufficient money to meet the acceptance which paid for a specified lot of identified rods, the reception of the money would not as a matter of legal necessity constitute a waiver of the condition not fulfilled; it would be merely the acknowledgment of the receipt of money to be applied upon the indebtedness of the Wire Co.

to them. An intent to waive upon knowledge is a question of fact, and it is not found in the case before us. Therefore such identified rods would continue to be the property of the applicants until the Wire Co. should meet the aforesaid conditions.

The New York Wire & Wire Spring Co. was organized in 1884 as a corporation under the laws of this state. The Wire Co. subscribed for and held one hundred and twenty-four shares, or one half of its stock, through a trustee who was the secretary and a director of both companies; one share was subscribed for and held by an individual; the remaining shares were subscribed for and held by another individual. No cash was paid upon the subscriptions. Checks were deposited with its treasurer for twenty per cent. thereof, but these were never paid. No advertisement was published, no certificate was filed with either the town clerk or the secretary of the state until June, 1885. Some business was done meantime in the name of the company. It is found that the organization was made in good faith, in the belief that it could profitably manufacture goods differing from those made by the Wire Co.

In June, 1887, Brown Brothers & Co. sold and delivered a specified lot of rods, No. 39, to the Wire Co., upon condition that the rods should continue to be their property until the Wire Co. should pay the acceptance importing them, and all other indebtedness of the Wire Co. to them which should have matured before or at the time of payment of the importing acceptance, with permission however to the Wire Co. to sell the same as the property of Brown Brothers & Co., and in case of sale to hand the avails, as soon as received, to them. The Wire Co. sold this lot of rods to the New York Wire & Wire Spring Co.

At the time of this sale the latter company was in the occupation and use of a portion of the premises and machinery of the Wire Co. The rods were then in a shed upon their premises, with other rods belonging to the Wire Co., all in the custody of the United States, held for payment of duty, the shed being a bonded warehouse. The sale was upon

credit; there was no change of location of the rods; they were never paid for; the Wire Spring Co. had not redeemed them from the revenue officer; they were in his possession, held for duty unpaid, at the time of its insolvency. The receiver of the Wire Co. subsequently redeemed them, together with rods belonging to the Wire Co., and the trustee of the Wire Spring Co. took possession of and sold them, and holds the proceeds as the property of the Wire Spring Co. While these rods were held for duties Brown Brothers & Co. notified the revenue officer holding them that they were their property and demanded possession. It is their claim that either the receiver of the Wire Co. or the trustee of the Wire Spring Co. should pay to them an amount equal to the proceeds of the sale of the rods before any payment should be made to creditors of either corporation; for these reasons, in effect:—that the Wire Spring Co. was never legally organized; that it was practically the Wire Co.; that therefore no valid sale by one to the other was possible; and that no sale was completed by delivery.

If the individuals who subscribed in form for the shares in the Wire & Wire Spring Co. did not complete what they in good faith attempted, namely, the creation of a corporation, they remained unincorporated persons associated in the conduct of the business of buying rods and manufacturing and selling wire under the name and style of the Wire & Wire Spring Co., having no identity with the Wire Co.; of course therefore capable of making valid contracts with the latter. Moreover, the Wire & Wire Spring Co. assumed to be and made contracts as a corporation; the Wire Co., in good faith as it is found, made contracts with it as such. It is not for Brown Brothers & Co., not a party to the contract in question, to object in this proceeding to the validity thereof.

Again, upon the finding the rods lot No. 39 were never in the absolute possession of the Wire Co. From the time of their arrival in New York until the insolvency of both the Wire Co. and the Wire Spring Co., the rods were in the custody of the United States, by a revenue officer, as secur-

ity for the duty thereon. Brown Brothers & Co. indorsed and delivered the bill of lading and the consular invoice to the Wire Co.; the right to possess, subject to the obligation to pay the duty; with leave also to sell. Not itself paying the duty, the Wire Co. sold them upon time, in good faith, with no intent to defraud Brown Brothers & Co., while yet in the bonded warehouse, to the Wire Spring Co.; the latter had not redeemed them at the time of its insolvency. Of course there had been no change of location. But the Wire Spring Co., by a completed purchase in good faith, acquired the property in them; the entire right, title and interest both of Brown Brothers & Co. and of the Wire Co.; an absolute right as against both of the parties, and as against all others as well. To the perfection of this right no change of location was necessary; the rods had continuously been in the possession of the United States as pledgee for the security of a debt. There is no finding that the Wire Co. desired or intended to preserve any lien, and it now disclaims any right or interest in them. There was nothing on the part of the Wire Co. which the law regards as a retention of possession.

But if there had been what the law would regard as a retention of possession it could not affect the case. It is enough if the sale was good between the parties. Brown Brothers & Co., although creditors of the Wire Co., are not claiming these rods as such, but as owners. They are standing wholly upon their original right to the rods. Besides this, the retention of possession, if regarded as such, was not a retention of possession by the Wire Co. of its own property, but of property that before the sale had been that of Brown Brothers & Co., and which was sold by the Wire Co. as their property and under authority given by them. It becomes a question therefore in which the creditors of the Wire Co. have no interest, as the title must be in the Wire Spring Co. under the sale to it, or, that sale being set aside, in Brown Brothers & Co.

In June, 1887, Brown Brothers & Co. sold and delivered a specified lot of rods to the Wire Co., upon condition that

the rods should continue to be their property until the Wire
Co. should pay the acceptance importing them, and all other
indebtedness of the Wire Co. to them which should have
matured before or at the time of payment of the importing
acceptance, with permission however to the Wire Co. to sell
the same as the property of Brown Brothers & Co., and
in case of sale to hand the avails as soon as received to
them. The acceptance importing the lot thus conditionally
sold and delivered in June, 1887, matured and was paid in
August following. This lot of rods was in the possession of
the Wire Co. at the time of its insolvency and passed into
the hands of the trustee as a part of its estate, and is now in
his hands, capable of identification.

In July, 1887, Brown Brothers & Co. sold and delivered
other specified lots of rods to the Wire Co. upon similar
conditions, with permission to sell as above stated. The
Wire Co. sold and received payment for these last specified
lots of rods in the month of July. But it has never handed
the avails of such sales to them. It mingled the money thus
received indistinguishably with and used it as its own. In
consideration of the agreement of Brown Brothers & Co. to
accept drafts for the use of the Wire Co., it agreed to give
them a "specific claim and lien on all rods and the proceeds
thereof," for the purchase of which they should furnish
money; and in addition, as security for any other indebted-
ness from it to them which should have matured at the time
of payment of the particular acceptances importing particu-
lar lots of rods.

In consideration of permission by Brown Brothers & Co.
to the Wire Co. to sell their rods as their property, it agreed
that, upon such sales, it would hold the proceeds separate
and apart from its own funds, and hand them as soon as
received to them; this by way of security for the payment
of whatever acceptances they should come under in its be-
half.

The result of all this is, that as long as these rods, thus
delivered upon conditions, are neither sold nor converted
into wire, but remain in the possession of the Wire Co. un-

changed and capable of identification, they are security to Brown Brothers & Co.; if sold, and the money is paid over, it is instantly applied, and extinguishes so much indebtedness, and thus performs the office of security in an absolutely perfect sense. And this is the meaning of the requirement to hand the avails as soon as received to Brown Brothers & Co. as "security for due provision for acceptances," etc.

Plainly, it was the intent of Brown Brothers & Co. upon sale of their rods by the Wire Co., that it should forthwith pay the proceeds to them; plainly, the Wire Co. agreed to make such payment. The fact that such payment, if made, might be applied upon the acceptance importing these rods not yet matured is of no importance.

The Wire Co. agreed to pay over the money upon reception; agreed to anticipate payments whenever it should sell rods and thus realize the profit of the importation; of course in accounting it would have interest upon any anticipated payment. Upon such sale Brown Brothers & Co. had not merely a contingent claim for unliquidated damages for neglect to deposit money as collateral security for a contract, but a matured claim for a sum certain; being for their own money in the hands of the Wire Co., had and received by it for them.

This promise of the Wire Co. in no degree hampered it in the transaction of its business because of any uncertainty as to their duty at any time. In the instance before us it received money in July from the sale, by permission, of rods belonging to Brown Brothers & Co. It knew the amount exactly. In August following, when it paid the acceptances importing rods delivered to it in June, if it desired to free those rods from condition and become the absolute owner thereof, it was in a position of such certainty that it could have made a tender valid in law. It is of no legal significance that when it paid the acceptance in August it did not inform Brown Brothers & Co. that it had previously sold rods belonging to them and then had the avails in its hands; their ignorance did not diminish its knowledge; it was their

right to receive, it was its duty to pay; and it had all knowledge as to the amount to be paid.

Therefore, upon reception and retention of such money in July, there was a matured indebtedness therefor from it to them. When, therefore, in August following, the Wire Co. paid to them the acceptance which imported the rods delivered to it in June previous upon the conditions above stated, it did not in addition pay the indebtedness which had matured in the previous month on account of the reception and retention of money from sales of property belonging to Brown Brothers & Co. Therefore, the conditions upon which it obtained possession of the specified lot of rods in the previous June having never been performed in full, those rods still remain the property of Brown Brothers & Co.

As between Brown Brothers & Co. and the Wire Co., if it should claim that in August they supposed that it had become absolute owner of the rods delivered in June by paying the acceptance importing them, it is to be answered, that in legal effect the withholding of information that it then had the avails of their property sold by it in its hands, was that of a continuing denial of such fact; and it is estopped from claiming any inference from their omission to demand money which it declared to them it had not received.

The words of the promise by the Wire Co. are, to pay any other " indebtedness." We find no warrant for excluding therefrom indebtedness existing because of the sale of rods conditionally delivered to it by Brown Brothers & Co. and of the receipt and retention of the avails.

Wherever in reference to a specified lot of rods, upon the finding it remains possible that an applicant made a conditional sale and delivery thereof to E. S. Wheeler & Co. of New Haven, with power to sell, and that the latter did sell and deliver them to the New Haven Wire Co., in such case the lien of such applicant would have been discharged, and neither of them has entitled himself to possession, as neither has done more than prove a possibility of lien.

The claims of Brown Brothers & Co., and of Heidelbach, Ickelheimer & Co., for rods identified as having been paid

for by them respectively by the acceptance of drafts drawn under a letter of credit issued to E. S. Wheeler & Co. of New Haven, because of the exhaustion of letters issued to the New Haven Wire Co., which rods were by the applicants delivered to E. S. Wheeler & Co. of New Haven upon their trust receipt, and by the latter invoiced to the New Haven Wire Co., are left open for an explicit finding as to which, of E. S. Wheeler & Co. and the New Haven Wire Co., was made their debtor by the applicants, severally, in these transactions.

In the progress of the business each one of the three applicants made conditional sales and delivery of rods owned by each to the New Haven Wire Co., the conditions being embodied in the trust receipts. Such receipt imposed upon it the obligation to preserve the power to identify the rods of each applicant until it had redeemed them from the conditions of the trust and made them its own. The applicants relied upon it to perform and believed it would perform its duty in this respect. But in fact, not redeeming the rods, it nevertheless, without the consent or knowledge or fault of the owners, mingled the rods of all, and made identification by either owner impossible.

These rods in confusion came into the possession of the receiver, together with the property of the Wire Co. In this proceeding each applicant asks for the return of the rods belonging to him. Of course their aggregated requests include all of the rods. But they have not joined. Each asks for himself regardless of others. Each asks for a separate judgment for specified rods. Neither has made proof of the amount of his contribution to the mass. Neither has made it certain that any judgment can be rendered in his favor which will not include property belonging to another, under the present form of application.

The Superior Court is advised to render judgments in favor of the applicants, severally, in accordance with the rule set forth in this opinion.

In this opinion PARK, C. J., PARDEE and LOOMIS, Js., concurred.

CARPENTER, J., (dissenting.) I will give as briefly as possible some of the reasons which lead me to dissent in these cases.

The New Haven Wire Company, a Connecticut corporation, desired to import iron rods from Europe to be used in its business of manufacturing wire. For that purpose they caused to be issued by Baring Brothers & Co. of London, a letter of credit to E. S. Wheeler & Co. of Liverpool; the credit to be used only in importing such rods. The Wire Company then constituted E. S. Wheeler & Co. its agents to purchase or order the rods. Wheeler & Co. then ordered a quantity of rods to be manufactured by a German manufacturer. When manufactured they were delivered to a steamship company in Antwerp to be transported to this country. The steamship company issued a bill of lading in blank and delivered it to Wheeler & Co. A consular invoice was also delivered to them. They then drew on the Barings by virtue of the credit for the amount stated by consular invoice to be the cost of the rods; and when the draft was presented for acceptance they caused to be delivered to the Barings the bill of lading and consular invoice filled up to their order. The draft, payable at a future day, was thereupon accepted. Wheeler & Co. then sold the draft, and with its avails paid to the manufacturer the price of the rods. The goods were then carried to New York, Baring Brothers & Co. consignees.

The Wire Company agreed to furnish funds in London, before the maturity of the draft, sufficient to meet it, together with commissions. The rods were delivered to the Wire Co. on giving its receipt, called a trust receipt, in which it agreed to hold the goods in trust for the Barings, as their property, and subject to their order, with liberty however to sell the same, provided that in case of sale it should account for and forthwith pay and deliver the proceeds or avails of the sale to the Barings. It also appears that the Wire Company used the rods in its business, confusing them with other goods of the same general character as it pleased. This had been the course of business for several years. All previous drafts

were provided for at maturity, as per agreement. On this occasion the draft was not provided for when the Wire Co. failed and its property and affairs passed into the hands of a receiver. That this is briefly a correct history of the transaction will not be denied.

This proceeding is an application by the Barings asking the court to direct the receiver to deliver to them, as their property, such rods as can be identified as having been imported with the avails of the draft accepted by them.

The pivotal question in the case is—what title did the Barings have in the goods in question? And that I apprehend depends largely upon the answer to another question, namely, from whom did they acquire that title?

The majority of the court have adopted the theory of the applicants' counsel, and hold that they acquired title from the German manufacturer; that in some way which I do not fully comprehend, they became the general absolute owners, under a contract to sell and deliver to the Wire Company on payment of the purchase money; and that when the goods were delivered to the Wire Company, it became a perfected conditional sale, the sole condition being that the title should not vest in the Wire Company until the price was paid.

To sustain this theory the learned counsel for the applicants virtually ask us not to be governed wholly or mainly by the written contract between the parties; not to adhere too closely to the settled policy of our law relative to the possession of personal property by creditors claiming a lien thereon; not to accept what the parties have expressed in their contract as their intention; but to find another and radically different intention, from what the parties have done and from the object they had in view, interpreted by technical commercial phrases, by the laws of trade of unusual application, and by the necessities of international commerce. The majority of the-court, by adopting their theory, seem also to have sanctioned the reasoning by which it was supported.

On the contrary, my view of the case is that the Barings

acquired no·title from the manufacturer, but did acquire
title from the Wire Company; that that title was not a
general absolute one, but a special and qualified one, as
mortgagees.

This view does not require me to imply a contract of a
different nature from the one expressed, but does allow me
to stand firmly and securely on the written contract of the
parties; and in interpreting that contract I have no occasion
to ignore or explain away any of its provisions, or to disre-
gard the law of this state, which I believe to be the same as
that of New York and of England. Nor am I required to
inject into it any obscure and hidden meaning, not expressed,
derived from technical phrases, the laws of trade and mod-
ern mercantile usage; nor, above all, am I required to intro-
duce into our system of jurisprudence a principle of doubtful
expediency, and one which, at·least so far as this case is con-
cerned, strikes a blow at the favorite policy of this state to
divide the assets of insolvent persons and corporations
equally among all the creditors; and that too for the bene-
fit of foreign creditors at the expense of our own citizens.

It will be observed that I travel side by side with my as-
sociates to this extent—I agree that the Barings had a title,
that that title was good against everybody until they de-
livered the possession to the Wire Company, and that the
title is now good against the Wire Company. But I differ
from them *in toto* as to the origin, nature and present va-
lidity of the title as against the creditors of the Wire Com-
pany. The latter is the important question; the two former
are only important as bearing upon that.

As to the origin. Before stating my own ground I wish
to notice the theory of the majority that the Barings were
the original purchasers, or in some other way derived title
from the German manufacturers. They were never author-
ized to purchase these goods, but Wheeler & Co. were.
They did not in fact purchase them, but Wheeler & Co., as
agents of the Wire Company, did. They were utter stran-
gers to the transaction until the draft was presented to them
for acceptance; and at that time the goods were purchased

and in the hands of the carriers. They did not furnish the money with which to pay for them, but they with others furnished the means of raising the money. If that of itself gave them title, it for the same reason gave title to Wheeler & Co., the Wire Company, and E. S. Wheeler & Co. of New Haven; and with greater reason, so far as the Wheeler companies are concerned, for they were not secured, and the applicants were.

But it is said that they received the bill of lading, and that that gave them a title. But a bill of lading is not ordinarily a muniment of title, but a symbol of possession. It may in some instances be evidence of title, precisely as possession is, but always subject to explanation. For the explanation we must look to the circumstances of each particular case; and in looking at the circumstances and documents in this case, it conclusively appears that the bill of lading was delivered to them for the sole purpose of vesting them with the possession in order to complete and give effect to their title as mortgagees. Any other view seems to me to be giving that instrument an effect which the parties never contemplated. Should we not go directly to the only true source of light—the contract? There it appears, *in terms*, that the Wire Co., aside from the bill of lading, conveyed title to the Barings. The inference is inevitable that the bill of lading was not to give title but simply to give possession.

My own claim, that they derived title from the Wire Co., can be sustained in few words. In the letter of credit they stipulated with the Wire Co. that the bills drawn by virtue of the credit should be duly honored " upon presentation at their banking house in London, if drawn and negotiated within six months from this date, and if accompanied by bills of lading for such goods filled up to the order of Baring Brothers & Co., and by consular invoice of the same to their order, for the account of whom it may concern." When the letter of credit issued they took a receipt from the Wire Co., in and by which it agreed that the goods purchased with the avails of drafts drawn by virtue of said credit, the

proceeds thereof, with satisfactory insurance, "*together with the bills of lading for the same, are hereby, in consideration of this credit, sold, assigned and transferred to Baring Brothers & Co.*"

This assignment the Barings required, as an essential requisite to issuing the letter of credit, and accepted the goods and bill of lading thereunder from the Wire Co. Here we have in the written or printed documents, required and signed by these parties, that which explicitly shows how, and from whom, these applicants derived title, with no intimation in those documents, or in the finding of the court, that they derived title in any other manner or from any other source. With this record before us it is difficult to see how we can regard them as having acquired a title directly from the German manufacturer.

What is the nature of that title? Is it general and absolute, or special and qualified, as that of mortgagees? The Court of Appeals in New York, in *Moors* v. *Kidder*, 106 N. York, 32, a case cited and relied on by the majority, virtually sustained the claim of these very applicants, made by their counsel in that case, that a similar contract, in which the operative words were "pledge" and "hypothecate," was a mortgage as distinguished from a pledge. It seems however that the exigencies of that case did not require them to notice the distinction between a title as general owner, and a special title as mortgagee—the vital question in this case—and they do not further allude to it.

But authorities are not needed; for the parties themselves have answered the question in language too plain to be misunderstood. Immediately following the operative words quoted above, is this significant and expressive language :— " as collateral security for the payment as above promised, and also of any other sums which may at the time of such purchase, or at any time before the making of the payment above promised, be owing by us to Baring Brothers & Co." And again :—" the provision for such bills of lading and other documents being intended merely for the purpose of affording additional security," etc.

If parties may be permitted to make their own contracts and express their own intentions, no further argument would seem to be required to sustain my position.

But why is this anxiety on the part of the counsel for the applicants to have the court practically ignore the real contract made by the parties, and regard their clients as general owners? I can see but one answer. It is because they know that in no other way can their claim be sustained. They know that the moment they concede that they are mortgagees, they must also concede that when they parted with the possession to the Wire Company, with permission to treat it in all respects as its own, that moment their lien on the goods, as against creditors, was irrecoverably gone. Hence their desire to change their clients from mortgagees to conditional vendors, and to convert a surrender of mortgaged chattels to the mortgagor into a delivery to a conditional vendee, the condition being that the title should not vest until the purchase price should be paid. By this device the rules of law regarding chattel mortgages can be circumvented and foreign creditors of an insolvent corporation can be preferred.

But I propose to examine this device a little more in detail. Where and with whom did the supposed conditional sale originate? Certain it is that the parties have made no such contract. We shall search this record through in vain to find any intimation that the parties or either of them entertained any such idea. It is said that the contract which the parties made is in legal effect a conditional sale. But the two kinds of contract have but few elements in common. They are radically different, and are followed by very different legal consequences. This case is a good illustration of the truth of that proposition. Does the court intend to sanction the claim, in substance, that a conditional sale should be inferred from what was done, the laws of trade, and the supposed necessities of modern commerce? There is one answer which should be regarded as fatal to that claim, that where there is an express contract the law will never imply one, especially a different one, covering the

same transaction. The law does not take it upon itself to make contracts for parties; and it never implies one except to carry into effect the presumed intention of the parties. There is no room here to presume an intention, and such an intention, for the parties have plainly expressed an entirely different one. Here is an express conditional sale *from the Wire Company to the Barings;* but it is upon the condition that it was to be defeated upon the performance of a *condition subsequent.* There is therefore no room to imply a conditional sale from *the Barings to the Wire Company, the condition being a condition precedent.*

The law declares the respective rights and duties of mortgagors and mortgagees; and by the application of that law hitherto there has been no difficulty in doing justice between the parties. The view taken by my brethren seems to me to introduce a change in their legal relations, and to give other and different rights and impose new obligations.

We agree, I think, that if this is a mortgage it is invalid as against creditors, in consequence of the delivery of the property to the Wire Company. That being so, it may be suggested that the decision will only affect these cases; and that if it is a mistaken interpretation of a contract, it will not be regarded as a precedent to disturb well settled rules of law. The vice of the decision, if there is any, is twofold. It is a precedent for all similar cases. Here are three before us now involving a large amount of money. How many more contracts of this nature now exist, and how many more will come into existence in consequence of this decision, it is impossible now to know. Again, I apprehend it will be urged as a precedent for treating all chattel mortgages as conditional sales. If it is, I must confess that at present I do not know how the claim can be answered. I can discover no sufficient ground on which a distinction can be made between this mortgage and any other.

I cannot see that the trust receipt materially affects the question I have discussed. It is simply an attempt to keep in force the provisions of the mortgage, notwithstanding the change of possession. It would seem that the parties regarded

it as essential for that purpose. I will only say that if the mortgage cannot continue of its own force, I do not see how it is aided by the receipt.